Tina **CHAMBERS**, Individually and as next friend of Tiahree K. Chambers; **Wallace Lee Chambers**; **Annie Mae Chambers**; and **Edward Johnson**, Appellants,

v.

**HERMANN HOSPITAL ESTATE**; The Hermann Trust; Hermann Hospital; Hermann Hospital, Inc.; and Gage Van Horn, Appellees.

No. 01–94–00981–CV.

Court of Appeals of Texas, Houston (1st Dist.).

April 25, 1996.

Ordered Publishing and Rehearing and Rehearing En Banc Denied May 29, 1997.

Gayle E. Oler, Dallas, Ray Shackelford, Winfred H. Morgan, Houston, for appellants.

Patricia L. Brooks, Michael Phillips, Houston, for appellees.

Before MIRABAL, COHEN and TAFT, JJ.

## OPINION

MIRABAL, Justice.

Plaintiffs filed suit based on an incident occurring at Hermann Hospital on April 23, 1991, in which hospital employee Ronald Chambers was killed, and his fellow employee Edward Johnson was injured, while trying to subdue a violent patient. The main issues in this case involve whether the exclusive remedy provisions of the Texas Workers' Compensation Act bar plaintiffs' claims against the hospital defendants, and whether the attending physician owed a duty to non-patient third parties. The trial court granted summary judgment for the defendants. We affirm in part, and reverse and remand in part.

Ronald Chambers was a patient-care technician, and plaintiff Edward Johnson was a food-service worker, at Hermann Hospital. Plaintiffs Tina Chambers and Tiahree K. Chambers are, respectively, the widow and daughter of Ronald Chambers, and plaintiffs Wallace Lee and Annie Mae Chambers are his parents.

On Saturday, April 20, 1991, a patient named Johnny Long, Jr. was brought to the emergency room, and remained at the hospital over the next three days to be treated for seizures and alcohol withdrawal. When he arrived, Long was violently combative, and was kicking, biting, and hitting those attempting to attend to him. Accordingly, they sedated him, then administered anti-seizure drugs and other medications for alcohol withdrawal, then secured him with leather restraints. The next day, Long was transferred to the hospital's neurological critical care unit, where Dr. Gage Van Horn was the attending physician. On the following day, April 22, Van Horn had Long transferred to an unsecured general patient floor, where treatment continued. That evening, Long became "agitated," but refused tranquilizer drugs.

The following morning, Long assaulted a nurse and attempted to leave the hospital. In response to a call for help, Chambers, Johnson, and Richard Larramore, a medical student, attempted to restrain Long, and, in the ensuing struggle, they all crashed through a grill—floor to ceiling in height— that covered an opening to an air shaft. They all fell together 24 feet, to the concrete floor below. Chambers and Larramore were killed, and Johnson and Long were injured. This suit followed.

Chambers' parents and Johnson sued Van Horn for bodily injury and wrongful death,

respectively, on causes of action for negligence and gross negligence; and they sued Hermann Hospital and related entities [1] (collectively, the Hermann defendants) for those same injuries, on causes of action for negligence, gross negligence, and intentional tort. Chambers' widow and child sued the Hermann defendants for wrongful death on causes of action for negligence, gross negligence, and intentional tort.

The Hermann defendants moved for summary judgment on the ground that on April 23, 1991, they had subscriber status under the Texas Workers' Compensation Act, and that therefore the recovery provided for under the Act was the exclusive remedy for compensating plaintiffs' losses. Hermann Hospital, Inc. additionally moved for summary judgment on the ground that it never owned or operated the hospital where the events made the subject of this suit took place.

Van Horn also moved for summary judgment, asserting the evidence conclusively showed that (a) he had no duty to plaintiffs; (b) alternatively, he breached no duty to plaintiffs; and (c) alternatively, any breach of duty to plaintiffs on his part did not proximately cause either Johnson's injuries or Ronald Chambers' death.

Plaintiffs filed cross-motions for partial summary judgment asserting that the Hermann defendants did not have subscriber status under the Texas Workers' Compensation Act, and that therefore the recovery provided for under the Act was not the exclusive remedy for compensating plaintiffs' losses.

In an order signed May 4, 1994, the trial court:

(1) granted partial summary judgment in favor of the Hermann defendants on plaintiffs' claims against them, except for the intentional tort claims, on the ground that the defendants had subscriber status under the Texas Workers' Compensation Act at the time of the occurrence in question and were entitled to judgment as a matter of law on the basis of the exclusive remedy provisions of that act;

(2) also granted summary judgment for Hermann Hospital, Inc. against plaintiffs on the ground that it never owned or operated the hospital where the events made the subject of this suit took place;

(3) denied plaintiffs' cross-motions for partial summary judgment against the Hermann defendants;

(4) granted Van Horn's motion for summary judgment on all of Johnson's and Chambers' parents' claims against him.

The summary judgment was made final by an order of severance signed on August 3, 1994. This appeal followed.

In their first and second points of error, plaintiffs assert the trial court erred (1) in granting partial summary judgment in favor of the Hermann defendants on the basis that the recovery provided for under the Texas Workers' Compensation Act was the exclusive remedy for compensating plaintiffs; and (2) in denying plaintiffs' cross-motions for partial summary judgment on that same issue.

The standard for appellate review of a summary judgment for a defendant is whether the summary judgment proof establishes, as a matter of law, that there is no genuine issue of fact as to one or more of the essential elements of the plaintiff's cause of action. *Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex.1970). The movant has the burden to show that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). Evidence favorable to the nonmovant will be taken as true in deciding whether there is a disputed material fact issue that precludes summary judgment. *Id.* Every reasonable inference must be indulged in favor of the nonmovants and any doubts resolved in their favor. *Montgomery v. Kennedy,* 669 S.W.2d 309, 310–11 (Tex.1984). A summary judgment for the defendant, dis-

---

**1.** The other entities were Hermann Trust, Hermann Hospital Estate, and Hermann Hospital, Inc.

posing of the entire case, is proper only if, as a matter of law, plaintiff could not succeed upon any theories pleaded. *Smith, Seckman, Reid, Inc. v. Metro Nat'l Corp.*, 836 S.W.2d 817, 819 (Tex.App.—Houston [1st Dist.] 1992, no writ); *Havens v. Tomball Community Hosp.*, 793 S.W.2d 690, 691 (Tex. App.—Houston [1st Dist.] 1990, writ denied); *Dodson v. Kung*, 717 S.W.2d 385, 390 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). Once the defendant produces sufficient evidence to establish the right to a summary judgment, the plaintiff must set forth sufficient evidence to give rise to a fact issue to avoid a summary judgment. *"Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 936–37 (Tex.1972).

The summary judgment in favor of Hermann Hospital, Inc., is supported by an independent ground—namely, that it never commenced doing business or appointed officers or directors, and never owned or operated the hospital where the events made the subject of this suit took place. Plaintiffs do not attack the trial court's ruling specifically granting summary judgment for Hermann Hospital, Inc., on that ground. Therefore, that portion of the judgment will be affirmed. *See Ins. Co. of North America v. Security Ins. Co.*, 790 S.W.2d 407, 410 (Tex.App.— Houston [1st Dist.] 1990, no writ) (party appealing from summary judgment must show that each independent ground asserted in the motion for summary judgment is insufficient to support the judgment).

The incident in which Johnson was injured and Chambers was killed took place after January 1, 1991, the effective date of all pertinent portions of a revision to the Texas workers' compensation system effected by former TEX.REV.CIV.STAT.ANN. arts. 8308–1.01 through 8308–17.19 (the Act).[2] The Act provides, in relevant part, as follows:

Art. 8308–3.23.[3]  Obtaining coverage.

(a) [A]n employer may elect to obtain workers' compensation insurance coverage.... An employer who obtains coverage is subject to the provisions of this Act.

Art. 8308–3.24.[4]  Notice to employees.

(a) An employer shall notify each employee in the manner provided by this section as to whether or not the employer has workers' compensation insurance coverage.

(b) The employer shall notify a new employee of the existence or absence of coverage at the time the employee is hired.

(c) An employer who obtains coverage ... shall notify each employee that the coverage has been obtained ... not later than the 15th day after the date on which the coverage ... is effective.

(d) Each employer shall post in the employer's place of business a notice as to whether or not the employer has workers' compensation insurance coverage. The employer shall revise the notice whenever the information it contains is revised.

(e) The notice required by subsection (d) of this section shall be posted at conspicuous locations at the employer's place of business as necessary to provide reasonable notice to the employees.

Art. 8308–3.25.[5]  Company notice of coverage[.]

(a) When an employer has secured workers' compensation coverage, the insurance company shall file notice of the

---

2. Act of December 13, 1989, 71st Leg., 2d C.S., ch. 1, secs. 1.01–17.19, 1989 Tex.Gen.Laws 1, 1– 122.

   Section 17.18 of the Act provided, in pertinent part:
   (a) This Act takes effect January 1, 1991, except as provided in Subsection (b).
   (b) Article 2, except Section 2.14, and Sections 17.10, 17.12, 17.13, and 17.14 take effect April 1, 1990. Articles 9 and 10 take effect June 1, 1991. Chapter D of Article 3 takes effect January 1, 1993. Chapter C of Article 6 takes effect January 1, 1992.

3. Now TEX.LABOR CODE ANN. § 406.002 (Vernon 1996).

4. Now TEX.LABOR CODE ANN. § 406.003 (Vernon 1996).

5. Now TEX.LABOR CODE ANN. § 406.004 (Vernon 1996).

coverage with the commission not later than the 10th day after the effective date of the coverage. Coverage is effective on the date a binder is issued or at a later date and time agreed to by the parties.

Art. 8308–4.01.[6] Exclusive remedy[.]

[A] recovery of workers' compensation benefits under this Act is the exclusive remedy of an employee or legal beneficiary against the employer ... for the death of or a work-related injury sustained by a covered employee.

Plaintiffs assert that, for the Hermann defendants to be entitled to summary judgment on the basis that they had "subscriber status" under the Act (and that workers' compensation benefits were therefore plaintiffs' exclusive remedy), the Hermann defendants were required to show that no genuine issue existed as to any of the following "elements" of "subscriber status":

(1) On April 23, 1991, the Hermann defendants were insured under a policy of workers' compensation insurance that had been issued after January 1, 1991;

(2) The Hermann defendants (a) properly posted notice in conspicuous locations in their place of business that workers' compensation insurance coverage had been obtained, and (b) gave notice of coverage to Ronald Chambers and Edward Johnson in the time and manner required by the Act.

(3) The Hermann defendants' insurance carrier filed notice with the Texas Workers' Compensation Commission (TWCC) not later than the 10th day after the date on which the coverage became effective.

Plaintiffs contend that the summary judgment evidence fails to conclusively establish in favor of defendants each of these three elements.

### (1) Workers' Compensation Coverage.

It is uncontroverted that Edward Johnson and Ronald Chambers were "employees" of Hermann Hospital on the date of the incident, April 23, 1991.

The Hermann defendants presented as summary judgment evidence the affidavit of Sharon Abel, vice president and custodian of policy records for Legion Insurance Company. Attached to the affidavit was a sworn copy of a policy of workers' compensation insurance issued by Legion to "Hermann Hospital et al." The policy period was from March 3, 1991 to March 3, 1992.

The Hermann defendants also presented as summary judgment evidence the affidavit of Mark Thomasson, administrative director of human resources for Hermann Hospital. Thomasson testified, in pertinent part, that

I have carefully reviewed the workers' compensation policy number WCI001525, issued by Legion Insurance Company providing coverage for Hermann Hospital.

. . . .

The insurance policy issued by Legion Insurance Company (policy number WCI001525) was a renewal of the policy we had with Legion which was policy number WCI 000294. I know from my own personal knowledge that this policy was to be renewed annually on or about March 3 of each year. I am familiar with the terms of policy number WCI 000294 which is the renewal number for workers' compensation insurance policy number WCI001525.

Thomasson's affidavit further stated that he had personal knowledge that Edward Johnson and Tina Chambers filed workers' compensation claims arising out of the incident; that Johnson had collected weekly benefits from Legion Insurance Co. and had had his medical expenses paid; and that Chambers, on behalf of herself and her child, had received "widow's benefits" from Legion Insurance Company.

The Hermann defendants' summary judgment evidence also includes Thomasson's complete deposition, as well as the depositions of V. Randolph Gleason, general counsel for Hermann Hospital, and Helena Barmore, who was a workers' compensation claim supervisor with an independent company that handled insurance claims for Legion Insurance Company—including Johnson's

---

**6.** Now Tex.Labor Code Ann. § 408.001 (Vernon       1996).

and Chambers' claims arising from the incident at issue.

Barmore testified that payments on the claims were by checks issued from Legion Insurance Company, and that the checks stated on their face "Legion Insurance Company for Hermann Hospital." Barmore further testified she processed the Johnson and Chambers workers' compensation claims, and that the manner in which she did so was consistent with a policy of workers' compensation insurance being in full force and effect.

The Chambers plaintiffs presented, in response, evidence that the first report of injury recited that the workers' compensation policy in effect at the time of the accident was policy number WCI–000294. The Chambers plaintiffs also filed copies of workers' compensation policy number WCI–001525, and workers' compensation policy number WCI–000294. They argued that the summary judgment evidence failed to establish exactly when the effective policy was issued, and which policy covered plaintiffs' claims.

The record is clear that a policy provided workers' compensation coverage for Hermann Hospital employees for the period March 3, 1990 to March 3, 1991, and thereafter a policy provided workers' compensation coverage for the period March 3, 1991 to March 3, 1992. The evidence is uncontroverted that Hermann Hospital was covered by workers' compensation insurance issued after March 3, 1991, when the first policy expired, and the insurance was in effect on April 23, 1991, the date of the injuries. Therefore, plaintiffs did not raise any material fact issues as to the first element of subscriber status.

### (2) Notice to employees.
#### a. Posted notices.

As summary judgment evidence, defendants filed the affidavit of the director of human resources at Hermann Hospital, Mark Thomasson. He stated that in January 1991, through April 24, 1991, and thereafter, notices of workers' compensation coverage for Hermann Hospital employees were posted in the following conspicuous places:

—on the employee bulletin board on the first floor of Hermann Hospital;

—in the employment office on the sixth floor of the Hermann Professional Building across the street from the hospital;

—on the employee bulletin board in the basement of the Hermann Professional Building.

Thomasson could not produce, three years later, actual copies of the notices that had been posted in 1991, but his testimony that the required notices were posted is uncontroverted.

#### b. Personal notice to employees Johnson and Chambers.

It is uncontroverted that Johnson and Chambers were both hired by Hermann Hospital before January 1, 1991.[7] Plaintiffs argue that, in order to comply with the new Act effective January 1, 1991, defendants were required to *re-notify* all existing employees, who had been previously notified at the time of hire, that they were covered under workers' compensation insurance. We find nothing in the Act that requires such re-notification in a case such as the present one.

Plaintiffs also complain that defendants did not prove as a matter of law that Johnson and Chambers received notice of workers' compensation coverage at the times they were hired. Defendants' summary judgment evidence describes the mandatory orientation programs in which Chambers and Johnson would have participated when they were hired. Workers' compensation was always discussed in such programs. The evidence contains records showing Chambers and Johnson attended such orientation programs. This evidence is uncontroverted.

### (3) Notice filed with Texas Workers' Compensation Commission.

When an employer has secured workers' compensation coverage, the insurance company is required to file notice of the coverage with the commission not later than the 10th day after the effective date of the coverage. Art. 8308–3.25 (now Labor Code

7. Johnson was hired May 15, 1987, and Chambers was hired August 6, 1990.

Sec. 406.006). It is uncontroverted in this case that Legion Insurance Company timely filed the required notice with the commission when the insurance coverage was first obtained in March 1990. The policy, by its terms, was to be renewed annually on or about March 3 of each year. It is uncontroverted that when the policy was renewed on March 3, 1991, Legion Insurance Company did not file another notice of coverage with the commission within 10 days. Plaintiffs claim the Act requires yearly notices of coverage to be filed with the commission every time a workers' compensation policy is automatically renewed. We disagree.

Article 8308–3.25 requires the filing of notice of coverage with the commission when an employer "has secured coverage." If an employer "terminates coverage," written notice must be filed with the commission pursuant to article 8308–3.26. Further, if the insurance company "cancels" a policy, or "does not renew it on its anniversary date," the insurance company must notify the commission, pursuant to article 8308–3.28(a). In fact, if the insurance company fails to give proper notice of cancellation or nonrenewal to the commission, the policy continues in effect until the required notice is given. Art. 8308–3.28(d). These provisions clearly indicate that, as long as the policy is renewed on its anniversary date, there is no need to notify the commission annually that the policy is still in effect.

■ We hold that the Hermann defendants proved, as a matter of law, that they were insured under a policy of workers' compensation insurance on the date of the incident; that they properly provided all notices required under the Act; and that plaintiffs have received workers' compensation benefits in connection with the incident in question. Accordingly, we hold that the Hermann defendants were entitled to judgment that the recovery provided for under the Act was the exclusive remedy for compensating plaintiffs' losses as against the Hermann defendants. We comment, however, on the alternative argument that, even if the Hermann defendants had failed to conclusively establish some of the elements discussed above, they still would have been entitled to

summary judgment. Plaintiffs insist all three elements had to be established for the Hermann defendants to succeed.

Plaintiffs rely on *Ferguson v. Hospital Corp. International, Ltd.,* 769 F.2d 268 (5th Cir.1985), and its progeny. In *Ferguson,* two nurses employed by Hospital Corp. International, Ltd. (HCI) were injured in an automobile accident on July 5, 1980, while on assignment in Saudi Arabia, and later brought a negligence action against HCI. HCI moved for summary judgment on the ground that the Texas workers' compensation act provided the plaintiffs' exclusive remedy. The district court denied summary judgment for HCI, ruling that HCI was not a subscriber under the act as then in effect because it had failed to provide notice of compensation coverage to the two nurses prior to the accident. 769 F.2d at 269. On appeal, the Fifth Circuit, in addressing what it then considered to be an unsettled issue of Texas law, undertook to decide the effect of an employer's failure to provide actual or constructive notice to its employees that it has provided for payment of workers' compensation for their injuries. *Id.* at 270. The Fifth Circuit held that, "In view of the history and purpose of notice requirements under the [workers' compensation act], ... [and] [b]ecause the workers' compensation scheme remains voluntary in Texas, an employer's notice to the state is critical to determine whether an employer had the intention to be a subscriber under the Act." *Id.* at 273. The court then concluded that "HCI's failure to comply with *any* of the notice provisions bars it from claiming subscriber status under the Act"— and, in turn, from relying on the exclusive remedy provisions of the act. *Id.* Addressing HCI's other contentions, the court also (1) held that post-injury notice could not deprive the employees of their action for common law damages; and (2) following this Court's decision in *Grimes v. Jalco, Inc.,* 630 S.W.2d 282, 285 (Tex.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.), held that the employees' acceptance of workers' compensation benefits under HCI's compensation plan for several months after they were injured did not constitute an election of remedies where no final judgment had been entered

with respect to the compensation claim. 769 F.2d at 273–75.

■ *Ferguson* is distinguishable from the present case. There, HCI had given its injured employees *neither actual nor constructive notice* of the coverage.[8] Additionally, *Ferguson* was decided under earlier Texas workers' compensation statutes, and not the Act applicable to the incident at issue here. The provisions of the workers' compensation act at the time of the accident determine the rights and duties of the parties. *Harris,* 814 S.W.2d at 523 (citing *Consolidated Casualty Ins. Co. v. Smith,* 309 S.W.2d 80, 84 (Tex.Civ. App.—Houston 1958, writ ref'd n.r.e.)).

■ With an exception not material here, article 8308–4.01 of the applicable Act provides that "a recovery of workers' compensation benefits under this Act is the exclusive remedy of an employee or legal beneficiary against the employer ... for the death of or a work-related injury sustained by a covered employee." There is no dispute here that each of Ronald Chambers and Edward Johnson was an "employee" of Hermann Hospital on the date of the incident at issue here, within the meaning of article 8308–1.03(18) of the Act.[9] Further, there is no dispute that they had at least constructive notice of the existence of the workers' compensation coverage, and there is no dispute that plaintiffs have received workers' compensation benefits in connection with the incident in question. Under these facts, even if pre-injury personal notice of coverage was not established as a matter of law, summary judgment was properly granted for the Hermann defendants. *See Rodriguez v. Martin Landscape Mgmt. Inc.,* 882 S.W.2d 602, 606 (Tex. App.—Houston [1st Dist.] 1994, no writ); *Pederson v. Apple Corrugated Packaging,* 874 S.W.2d 135, 138 (Tex.App.—Eastland 1994, writ denied).

We overrule points of error one and two.

8. *See* 769 F.2d at 273 ("We conclude that HCI's failure to comply with *any* of the notice provisions bars it from claiming subscriber status under the Act."); *see also Kielwein v. Gulf Nuclear, Inc.,* 783 S.W.2d 746, 747 (Tex.App.—Houston [14th Dist.] 1990, no writ) ("*Ferguson* is clearly distinguishable in that its plaintiffs had neither actual nor constructive notice, thus the Fifth

In their third point of error, appellants assert the trial court erred in granting appellee Van Horn's motion for summary judgment against Johnson and Chambers' parents.

In support of his motion, Van Horn presented (a) the affidavit of the custodian of records for Hermann Hospital, proving up some 342 pages of medical records generated during Johnny Long's stay at Hermann Hospital beginning on April 20, 1991, and during an earlier stay, from December 8, 1985 to December 10, 1985, for treatment for alcohol withdrawal seizures; (b) the affidavit of B.J. Wilder, M.D.; and (c) his own affidavit.

After detailing his qualifications, Wilder testified that he had reviewed Long's medical records attached to the motion for summary judgment; and that he was familiar with the standard of care for a physician rendering care to patients like Long, in circumstances the same as or similar to those under which Van Horn had treated Long. In pertinent part, Wilder said,

> If a neurology critical care unit is available, the patient should be treated in the neurology critical care unit until stable. However, once the patient has stabilized, the patient should be removed from the neurology critical care unit and into a private room for further observation.

> Restrictive physical restraints are not medically warranted for patients with seizure disorders unless the patient presents an imminent threat of harm to himself or others. The exercise of sound medical judgment requires that treatment be oriented to the least restrictive setting and mandatory physical restraints should only be used in extreme situations. Once stable, the patient seeking treatment for a seizure disorder can safely occupy a private hospital room, and such patients commonly move freely in public with no threat of danger to others.

Circuit Court of Appeals did not decide whether pre-injury notice to employees is sufficient to bar a common law suit for injury.").

9. Act of December 13, 1989, 71st Leg., 2d C.S., ch. 1, sec. 1.03(18), 1989 Tex.Gen.Laws 1, 3.

Based upon my education, training and experience, as well as my review of the attached medical records of Johnny Long, Jr., it is my expert opinion that Gage Van Horn fully adhered to the appropriate standard of care in rendering care to [Long].

. . . .

In view of the attached records, it is apparent that [Long] had stabilized as of April 22, 1991. He was alert and cooperative and had experienced no further seizures since those which brought him into the hospital on April 20, 1991. Additionally, on April 22, 1991, an EEG was performed which was normal.

Having stabilized, [Long] no longer required the facility of the [neurology critical care unit]. The patient therefore transferred to a private room for further observation. This was appropriate under the circumstances, and the attached records fail to reflect any medical necessity for Dr. Van Horn to have prevented the transfer at the time that the transfer was made. Likewise, the attached records fail to reflect any medical necessity for Dr. Van Horn to have ordered the imposition of mandatory physical restraints upon [Long's] transfer to a private room. [Long] had stabilized under appropriate medication therapy, and his condition had improved such that he did not present an active threat of imminent harm to himself or others.

It is apparent from the attached records that Dr. Van Horn received no further communication regarding [Long] until after the incident at issue in this case. According to the records, the incident arose on the morning of April 23, 1991, when [Long] became involved in a confrontation that resulted in several people falling down an airshaft. There was nothing in the records I reviewed that could have predicted the events that took place on the morning of April 23, 1991, or the accident in the airshaft.

In stating this opinion, I am aware that the records indicate that [Long] expressed a desire to go home on the evening of April 22, 1991. However, it is not unusual for hospital patients to want to go home, and it further appears from the records that [Long] passed through the night without incident after speaking with the intern on call. In reasonable medical probability, there simply was no clinical signal that [Long] would become involved in the confrontation that led to the accident in the airshaft, prior to the time of the confrontation on the morning of April 23, 1991.

In his affidavit, Van Horn first detailed his qualifications. He then testified that he had reviewed Long's medical records attached to the motion for summary judgment, and that he was familiar with the applicable standard of care. Van Horn then gave his expert opinion that his own care rendered to Long "fully met or exceeded" that standard; that portion of Van Horn's affidavit was consistent with, and substantially the same as, the portions of Wilder's affidavit quoted above.

In their response, Chambers' parents and Johnson presented excerpts from the same medical records attached to Van Horn's motion for summary judgment. They also raised exceptions and objections to both Wilder's and Van Horn's affidavits, in their entirety, and presented a legal argument that, on the facts shown by the summary judgment evidence, Van Horn had a duty to prevent his patient Long from injuring third parties. Finally, they presented the affidavit of Stephen J. Kramer, M.D. In his affidavit, Kramer first detailed his qualifications. He then testified that he had reviewed Long's medical records, and that he was familiar with the applicable standard of care. In pertinent part, Kramer said,

My name is Stephen J. Kramer, M.D. I am over 18 years of age and I am fully competent to make this affidavit. **I have personal knowledge of the facts stated herein and they are all true and correct to the best of my knowledge and belief.**

. . . .

In reviewing these medical records it appears that upon admission to the hospital, [Long] had a primary diagnosis of a seizure disorder and a secondary diagnosis of alcohol withdrawal. This secondary diagnosis was made by the emergency room intern who initially treated [Long] and

made the decision to admit him to the neurology critical care unit (NCCU) on April 20, 1991. Following [Long's] admission to the NCCU, he was seen the next day by [Van Horn] who apparently took [Long's] then decreased seizure activity as an indication that his condition had stabilized sufficiently to allow his transfer to a regular room. However, there is no indication in the medical records that [Van Horn] ever considered the secondary diagnosis of alcohol withdrawal in his treatment of the patient on April 22, 1991 nor his decision to place him in a regular room without the close observation and safeguards available in the NCCU.

[I]t is my expert opinion that [Long] was displaying symptoms of this secondary diagnosis of alcohol withdrawal while in the NCCU and before his transfer. This conclusion is supported by Dr. Stone's notes on the evening of April 22, 1991 in which he indicated that the patient was agitated and expressed a desire to go home because of a fear of losing his job. [Stone's] note goes on to indicate that the patient was "quite agitated and aggressive on arrival to room as is *apparently a frequent occurrence* for him" (emphasis added). This statement suggests that hospital records available to [Van Horn] indicated at the time of treatment that [Long] had a previous medical history of violent and aggressive behavior that should have been addressed.... [I]t is my expert opinion that, because of the secondary diagnosis and his past history of aggressive behavior, that the accepted standard of care required that [Long] should not have been transferred out of NCCU into a room where he was alone and without either restraints, supervision, and/or the proper medication to treat his alcohol withdrawal. The accepted standard of care required that he should have been maintained in a supervised environment while a psychiatric evaluation was performed and it is unfortunate that such an evaluation was not performed until after the tragic incident of April 23, 1991. It is also my expert opinion that physical restraints might not have been required if the patient had been placed under close observation/supervision and properly medicated to prevent a repeat of the aggressive tendencies demonstrated in the emergency room and NCCU and confirmed by [Long's] medical history. [I]t is my opinion, based upon a reasonable degree of medical probability, that [Van Horn] did not comply with, and deviated from, the appropriate standard of care in rendering treatment to [Long], and that his acts and omissions caused or contributed to the accident in the airshaft and the injuries that resulted from the accident.

(Bold emphasis added).

Van Horn replied to Johnson's and Chambers' parents' response by, first, countering their legal argument that, on the facts shown by the summary judgment evidence, Van Horn had a duty to prevent his patient Long from injuring third parties. Van Horn also attacked the Kramer affidavit on the bases that the affidavit was defective because Kramer swore only that his statements were "true and correct to the best of my knowledge and belief"; and that, in any event, the affidavit did not suffice to raise a genuine issue of material fact.

We turn first to Van Horn's contention that Kramer's oath in that affidavit that "I have personal knowledge of the facts stated herein and they are all true and correct to the best of my knowledge and belief" is insufficient to comply with the requirement of *Humphreys v. Caldwell,* 888 S.W.2d 469 (Tex.1994) (orig. proceeding). We disagree.

In *Humphreys,* the supreme court held that the affidavits offered by State Farm Mutual Automobile Insurance Company, one of the relators, were of no probative value and legally insufficient to support its contention that the information that Farley, the plaintiff in the underlying litigation, was seeking to discover, was privileged or otherwise exempt. The court said,

An affidavit which does not positively and unqualifiedly represent the facts as disclosed in the affidavit to be true and within the affiant's personal knowledge is legally insufficient. The affidavits before us state that the affiant's statements are based on his "own personal knowledge and/or knowledge which he has been able to acquire

upon inquiry" and, hence, fail to unequivocally show that they are based on personal knowledge. Additionally, the affidavits provide no representation whatsoever that the facts disclosed therein are true. Because of these defects, the affidavits are legally invalid and cannot serve as evidence in support of State Farm's claims of privilege.

888 S.W.2d at 470–71.

Here, Kramer's affidavit does represent that the facts disclosed therein are true, and does not assert that any statement is or may be based on inquiry. The language, "to the best of my knowledge and belief," while superfluous and ill-advised, does not deprive Kramer's affidavit of evidentiary value. Whether he says so or not, any witness who testifies that facts are true and correct can do so only to "the best of his knowledge and belief." Van Horn's contention that Kramer's affidavit was deficient because he swore only that his statements were "true and correct to the best of my knowledge and belief" is without merit.

■ Next, we consider whether Van Horn had a duty to Johnson and Ronald Chambers in connection with the medical care he rendered to Long. As a general rule, one person is under no duty to control the conduct of another, even if he has the practical ability to exercise such control; yet certain relationships do impose, as a matter of law, certain duties toward third parties. *Graff v. Beard,* 858 S.W.2d 918, 920 (Tex. 1993); *Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex.1983) (citing, *inter alia,* Restatement (Second) of Torts §§ 315, 316–320). Too, as a general rule, a person is under no legal duty to come to the aid of another in distress. *Otis Eng'g,* 668 S.W.2d at 309. This latter rule, in general, applies equally to a physician as to any other person. *See Fought v. Solce,* 821 S.W.2d 218, 220 (Tex.App.—Houston [1st Dist.] 1991, writ denied) (absent an agreement between physician and individual, physician has no duty to treat the individual). This latter general rule, is, likewise, not without its exceptions.

■ One who, in the absence of a preexisting duty to act, nonetheless voluntarily enters an affirmative course of action affecting the interests of another is regarded as assuming a duty to act, and must do so with reasonable care. *Otis Eng'g,* 668 S.W.2d at 309 (citing *Colonial Sav. Ass'n v. Taylor,* 544 S.W.2d 116 (Tex.1976); and *Fox v. Dallas Hotel Co.,* 111 Tex. 461, 240 S.W. 517 (1922)). Appellants contend that this case is controlled by *Otis Engineering.*

■ *Otis Engineering* concerned a wrongful death action arising from a collision between an automobile driven by an Otis employee, Matheson, and a second auto in which Larry and Clifford Clark's wives were riding. *Id.* at 308. Partway through Matheson's shift at Otis' plant, other employees observed him in an intoxicated condition, "weaving and bobbing on his stool and about to fall into his machine." *Id.* Matheson's supervisor, Roy, suggested to Matheson that he should go home; as he escorted Matheson to the company's parking lot, he asked Matheson if he was all right and if he could make it home, and Matheson answered that he could. Shortly afterward, the fatal accident occurred nearby. *Id.* The trial court granted summary judgment for Otis, holding that, as a matter of law, Otis owed no duty to the Clarks. *Id.* at 309. The supreme court affirmed the court of appeals' decision reversing that summary judgment; the court held that the summary judgment evidence raised a genuine issue of material fact concerning whether Matheson's employer Otis had taken control over Matheson because of his incapacity, and accordingly had a duty

> to take such action as a reasonably prudent employer under the same or similar circumstances would take to prevent the employee from causing an unreasonable risk of harm to others. Such a duty may be analogized to cases in which a defendant can exercise some measure of reasonable control over a dangerous person when there is a recognizable great danger of harm to third persons. *See, e.g.,* Restatement (Second) of Torts, § 319[.] [10]

*Id.* at 311.

Here, as in *Otis Engineering,* the conflicting summary judgment evidence presented

10. Section 319 provides: "One who takes charge of a third person whom he knows or should

was sufficient at least to raise an issue of fact concerning whether the treating physician here—Van Horn—had taken control over the patient. The summary judgment evidence also raised a fact issue concerning whether there was a recognizable—*i.e.*, foreseeable—danger of harm to others visiting, working, or being treated in the hospital, such that a reasonably prudent physician would have taken additional precautions, under the same or similar circumstances. Therefore, if *Otis Engineering* controls here, the summary judgment cannot be affirmed on the basis that Van Horn owed no duty to Johnson and Ronald Chambers in connection with the medical care he rendered to Long.

Van Horn, for his part, directs our attention, instead, to *Bird v. W.C.W.*, 868 S.W.2d 767 (Tex.1994). There, psychologist Bird examined a child for signs of sexual abuse, and concluded that the natural father, W.C.W., had sexually abused the child. Bird's affidavit reporting her conclusion was filed in the family court by the child's natural mother, B.W., in an effort to secure modification of existing child custody and visitation orders. Criminal and civil proceedings were initiated against W.C.W., based on the assertion that he had abused the child, but were eventually dropped; he then sued Bird and the professional association that employed her. 868 S.W.2d at 768. The trial court granted summary judgment in favor of the defendants, based on their assertion that they owed no professional duty of care to W.C.W. not to negligently misdiagnose the condition of the child. The supreme court agreed, noting at the outset that "while couched in terms of negligent misdiagnosis, the essence of the father's claim is that it was Bird's *communication* of her diagnosis that caused him emotional harm and related financial damages."

*Id.* at 768–69. Nevertheless, the court then proceeded to address the question of whether, in light of the same factors it had considered in *Otis Engineering*,[11] it should impose a duty on a mental health professional to a parent not to negligently misdiagnose a condition of the child. *Id.* at 769. Ultimately, the *Bird* court concluded, more broadly, that a mental health professional owes no such professional duty to *any* third party with respect to *any* patient. *Id.* at 772.

Van Horn contends that *Otis Engineering* is inapposite here; he reasons that (i) the duty addressed in *Otis Engineering* stemmed from the employer-employee relationship between Otis and Matheson, and (ii) the case stands only for the proposition that an employer has a duty to refrain from endangering the driving public by placing a drunken employee behind the wheel of a car—which, Van Horn observes, has nothing to do with neurology care of a seizure patient. He contends that *Bird* controls here because, he says, this case, like *Bird* before it, involves the question of whether a mental health professional owes a professional duty to a third party not to negligently misdiagnose his own patient.

We do not agree with Van Horn's reading of the *Otis Engineering* opinion. First, in our view, the duty the supreme court imposed in *Otis Engineering* did not arise exclusively from the employer-employee relationship between Otis and Matheson, but instead from Roy's voluntary intervention into the developing situation; the court held that that affirmative intervention, when undertaken in the course and scope of Roy's employment as Otis' servant, constituted assumption by Otis of a duty to act with reasonable care.[12] We recognize that

know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." Restatement (Second) of Torts, § 319 (1965).

11. "In determining whether to impose a duty, this Court must consider the risk, foreseeability, and likelihood of injury weighted against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury and the consequences of placing that burden on

the actor." *Bird,* 868 S.W.2d at 769 (citing, *inter alia, Otis Eng'g,* 668 S.W.2d at 309).

12. *See also Graff,* 858 S.W.2d at 920. There, although the supreme court first characterized *Otis Engineering* by saying, "[W]e recognized a duty in that instance because of the employer's authority over the employee," it then immediately went on to say, "As we later explained in *Greater Houston Transportation Co.* [*v. Phillips,* 801 S.W.2d 523, 526 (Tex.1991) ], our decision in *Otis* was premised on 'the employer's *negligent exercise of control* over the employee,' rather

other courts that have addressed the question have reached the opposite result.[13] Concerning the second branch of Van Horn's reading, we can find no indication, express or implied, in the opinion that the court intended for the case to be limited to its own facts. In that connection, we note that neither the *Colonial Savings* nor the *Fox* cases that the *Otis Engineering* court cited concerned either an employer or any other defendant who had breached a duty to refrain from endangering the driving public by placing a drunken person behind the wheel of a car.[14]

We are persuaded that this case is more akin to *Otis Engineering* than to *Bird.* In *Otis Engineering,* the source of the harm to

the plaintiff was, as here, the actions of the one—be he drunken employee or combative patient—of whom the defendant took charge and then failed reasonably to control. In contrast, in *Bird,* unlike here, the harm to the plaintiff stemmed not from a health professional's failure to control the actions of the patient; instead the source of the harm to the plaintiff in *Bird* was (i) the content of the professional's diagnosis, which falsely attributed her patient's condition to criminal acts on the plaintiff's part; coupled with (ii) the communication of that content to third parties.

Appellants' out-of-state cases, although instructive, include none that is directly on point here;[15] and the Texas cases to which

---

than on a general duty to prevent intoxicated individuals from driving."

13. *See First Interstate Bank v. S.B.F.I., Inc.*, 830 S.W.2d 239, 244 (Tex.App.—Dallas 1992, no writ) (observing that Texas courts have not expanded *Otis Engineering* beyond employer-employee context, and declining to do so); *see also Crider v. United States*, 885 F.2d 294, 298 (5th Cir.1989), *cert. denied*, 495 U.S. 956, 110 S.Ct. 2561, 109 L.Ed.2d 743 (1990) (same) (cited in *S.B.F.I.*). *But cf. Verdeur v. King Hospitality Corp.*, 872 S.W.2d 300, 302 (Tex.App.—Fort Worth 1994, writ denied) (although court affirmed summary judgment based on its holding that *Otis Engineering* creates no duty to the intoxicated employee herself, court refused to limit *Otis Engineering* to situation where employee becomes intoxicated on the job, as opposed to reporting for work already intoxicated). We note that, as we have, the Fifth Circuit in *Crider* recognized the significance, in *Otis Engineering,* of the employer's "affirmative act of control" over the incapacitated person; although it then treated the existence of such an "affirmative act of control" and the existence of an employer-employee relationship between the actor and the incapacitated person as if they were conjunctively required for *Otis Engineering* to apply. 885 F.2d at 298. We diverge from the *Crider* court in this latter respect.

14. The *Colonial Savings* case involved an address in Houston at which two houses Taylor owned were located—an older house near the street and a newer house behind it. Colonial Savings was the holder of a mortgage covering both structures, and obtained a fire insurance policy covering only the older house. The newer house subsequently burned, and the issue, on appeal from the trial court's j.n.o.v. that Taylor take nothing, was whether Colonial, in the absence of a preexisting duty, had voluntarily undertaken to provide fire insurance coverage on the mortgaged property and thereby assumed a duty to perform

that undertaking in a non-negligent manner. 544 S.W.2d at 117, 118.

The *Fox* case was a wrongful death suit. Fox was a night watchman at a store in a building owned by the Dallas Hotel Company (DHC), and was an employee not of DHC, but rather, of its tenant that operated the store. 240 S.W. at 517. Fox was fatally injured by a malfunctioning elevator; under his employer's agreement with DHC, it was DHC that was responsible for keeping the elevators in good repair. After his survivors recovered a judgment from Fox's employer and its insurer, they sued DHC. The district court, when asked to direct a verdict for DHC on the ground that DHC owed no duty, refused; and instead charged the jury that DHC owed Fox a duty to exercise ordinary care to maintain the elevator in a reasonably safe condition. *Id.* at 518. The supreme court held that DHC did indeed owe Fox just such a duty, because " 'in every situation where a man undertakes to act or to pursue a particular course, he is under an implied legal obligation or duty to act with reasonable care[.]' " *Id.* at 521 (quoting contemporary treatise).

15. *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976), involved a voluntary psychiatric outpatient, Poddar, who informed Moore, his therapist, that he was going to kill an unnamed girl, readily identifiable as Tatiana Tarasoff, when she returned home from spending the summer abroad. 131 Cal.Rptr. at 21, 551 P.2d at 341. The trial court sustained the defendants' demurrer. *Id.* at 20, 551 P.2d at 340. The California Supreme Court reversed in part, holding that Tarasoff's survivors' complaint—against Moore, his employer, and other therapists it also employed—could be amended to state a cause of action for negligent failure to protect Tarasoff. *Id.* at 22, 33, 551 P.2d at 353, 342. The court reasoned that "by entering into a doctor-patient relationship the therapist becomes sufficiently in-

the parties have cited us—apart from *Otis Engineering* and *Bird*—are readily distinguishable.

In *Wilson v. Winsett*, 828 S.W.2d 231 (Tex. App.—Amarillo 1992, writ denied), when

Standifer, the decedent, applied for disability benefits, physician Winsett examined her at the request of the Texas Rehabilitation Commission, to report to the Commission on her rehabilitative potential. *Id.* at 231. The

volved to assume some responsibility for the safety, not only of the patient himself, but also of any third person whom the doctor knows to be threatened by the patient." *Id.* at 24, 551 P.2d at 344.

In *Thompson v. County of Alameda*, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (1980), a juvenile offender had been confined in a county institution under court order, because of his "latent, extremely dangerous and violent propensities" toward committing sexual assaults upon young children. Within 24 hours of his temporary release to his mother's custody at her home, he murdered the plaintiffs' five-year-old son in the garage of that home—in accordance with an earlier threat that, if released, he would kill "a young child residing in the neighborhood." 167 Cal.Rptr. at 72, 614 P.2d at 730. The court distinguished *Tarasoff*, and held that "public entities and employees have no affirmative duty to warn of the release of an inmate with a violent history who has made nonspecific threats of harm directed at nonspecific victims." *Id.* at 77, 614 P.2d at 735. Accordingly, the court upheld the trial court's order sustaining defendants' demurrer and dismissing the case. *Id.* at 72, 80–81, 614 P.2d at 730, 738.

In *Lipari v. Sears, Roebuck & Co.*, 497 F.Supp. 185 (D.Neb.1980), Cribbs, formerly a psychiatric inpatient under auspices of the Veterans Administration, purchased a shotgun from a Sears store, shortly before resuming treatment at the V.A. as an outpatient. That treatment lasted approximately one month, until Cribbs terminated it against the doctors' advice; about one month after that, Cribbs shot up a night club, wounding Lipari and killing her husband. Lipari sued Sears, and added the United States in an amended complaint, in which she alleged that the V.A. was negligent in failing to detain Cribbs or initiate civil commitment proceedings against him. 497 F.Supp. at 187. The district court denied the United States' motion to dismiss or for summary judgment, holding that "under Nebraska law the relationship between a psychotherapist and his patient gives rise to an affirmative duty ... that the therapist initiate whatever precautions are reasonably necessary to protect potential victims of his patient." *Id.* at 188, 193.

*Bradley Center, Inc. v. Wessner*, 250 Ga. 199, 296 S.E.2d 693 (1982) was a wrongful death suit. Matthew Wessner's marital problems first induced him to become a voluntary psychiatric inpatient at Bradley Center in October 1974, at which time he confided to the center's personnel that he had homicidal impulses toward his wife and a man with whom she had been having an affair. He stayed about one month, during which time his wife was also voluntarily admitted to the center, for depression and guilt over

the affair. Wessner was voluntarily readmitted after a suicide attempt the following January. 287 S.E.2d at 718. At some point after the divorce had become final, Wessner, while on a day pass, confronted his ex-wife and her lover, and shot and killed both of them. The children of the marriage sued the center for the wrongful death of their mother, and obtained a substantial jury verdict. *Id.* at 719. Relying, in part, on Restatement (Second) of Torts, § 319 (1965), the court held that

> where the course of treatment of a mental patient involves an exercise of 'control' over him by a physician who knows or should know that the patient is likely to cause bodily harm to others, an independent duty arises from that relationship and falls upon the physician to exercise that control with such reasonable care as to prevent harm to others at the hands of the patient.

287 S.E.2d at 720, 721.

In *Petersen v. State*, 100 Wash.2d 421, 671 P.2d 230 (1983), Knox, shortly after being released from involuntary inpatient psychiatric care at a state hospital, ran a red light while under the influence of drugs, and struck Petersen's automobile, injuring her. *Id.* at 234. Petersen sued the State, alleging that her injuries were proximately caused by its failure to seek to confine Knox longer or its failure to disclose, either to his probation officer or the convicting court, information about his drug use in violation of his parole. She presented evidence of Knox's extensive history of drug abuse, which included frequent recent use; and of an incident just before his discharge in which he was driving on the hospital grounds in a reckless fashion that involved spinning his car in circles. The jury returned a verdict in her favor. *Id.* at 235. The Washington Supreme Court affirmed, holding that Knox's doctor had "incurred a duty to take reasonable precautions to protect anyone who might foreseeably be endangered by [his] drug-related mental problems." *Id.* at 237.

Finally, *Young v. Huntsville Hospital*, 595 So.2d 1386 (Ala.1992), was a premises liability case. While she was in the hospital to be treated for kidney stones, and was heavily sedated, Young was sexually assaulted by an intruder, Moore, who had previously trespassed on the premises. *Id.* at 1387, 1389. The trial court directed a verdict against her in the ensuing suit. The Alabama Supreme Court reversed, holding that the special relationship between a sedated or anesthetized patient—unable or less able to protect herself from an assault—and a hospital or other health care facility creates a duty on the facility's part to protect the patient from criminal acts of third parties. *Id.* at 1389, 1388.

Amarillo Court of Appeals held that Winsett had no duty to disclose to Standifer the signs of incipient cancer he discovered. *Id.* at 233. The case involved no question of any danger to, or corresponding [16] duty to, a third party. The same observation is true of our decision in *Fought;* there, the question in issue was whether Solce had any liability to Fought, a motorcycle rider victimized by a hit-and-run driver, after refusing to establish a patient-physician relationship with Fought. 821 S.W.2d at 219.

In *Flynn v. Houston Emergicare, Inc.,* 869 S.W.2d 403 (Tex.App.—Houston [1st Dist.] 1993, writ denied), the doctor, Kremer, examined Broadus at a hospital emergency room, and found that the acute symptoms Broadus reported, and which he thought were associated with a heart attack, were actually due to Broadus' recent use of cocaine. Broadus later injured Flynn in an automobile accident. *Id.* at 404. In our opinion, the primary precedent we considered was *Gooden v. Tips,* 651 S.W.2d 364 (Tex.App.—Tyler 1983, no writ); we concluded that the issue in the case then before us, as in *Gooden,* was whether the doctor had a duty to *warn* his patient not to drive, not whether he had a duty to *prevent* the patient from driving. *Id.* at 405, 406. The outcomes in the two cases differed because in *Gooden*—unlike in *Flynn*—the doctor, Tips, created the hazard to the Goodens and other third parties by prescribing Quaalude for his patient, Goodpasture, without warning her not to drive while under its influence. 651 S.W.2d at 365. To the extent that *Gooden* and *Flynn* both represent applications of the broader principle that one who voluntarily enters an affirmative course of action affecting the interests of another must act with reasonable care, both are actually supportive of—or, at least, consistent with—the imposition of a duty on Van Horn in this case.[17]

Finally, in *Williams v. Sun Valley Hospital,* 723 S.W.2d 783 (Tex.App.—El Paso 1987,

writ ref'd n.r.e.), the court of appeals affirmed a summary judgment entered in favor of the defendant hospital. Its patient, Herrera, had voluntarily admitted himself for depression. Two days later, he left the hospital grounds by climbing over a high brick wall, and more than a mile away he jumped in front of a passing car, killing himself and injuring Williams, the driver. The hospital contended that it owed no duty to Williams and that the collision and injuries to Williams could not have been reasonably foreseen. *Id.* at 784. The court of appeals agreed. With respect to the lack of duty in particular, the court noted that in the absence of a valid civil commitment order, the hospital had no authority to confine Herrera against his will; and in the absence of any indications that Herrera posed a threat or danger to a readily identifiable person, the hospital had no duty to seek such a commitment order. *Id.* at 787. Here, however, there were such indications; it is undisputed that when Long was brought into the emergency room, he was violently combative, and was kicking, biting, and hitting those attempting to attend to him—all of which necessitated sedation and leather restraints. This case is further distinct from *Williams,* on the very basis on which the *Williams* court distinguished *Otis Engineering:* "unlike the Otis employee who had physical manifestations of intoxication when he was required to leave the company plant, Mr. Herrera had never manifested an intention to elope or escape from the hospital prior to his climbing over the wall and leaving of his own accord." Here, however, the summary judgment evidence shows that on the evening before the incident in which Johnson was injured and Chambers was killed trying to prevent Long from leaving the hospital, Long was agitated and *expressed a desire to go home because of a fear of losing his job.*

We hold that *Otis Engineering* controls here, and the summary judgment cannot be

---

16. " 'The risk reasonably to be perceived defines the duty to be obeyed[.]' " *Phillips,* 801 S.W.2d at 526 (quoting *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 162 N.E. 99, 100 (1928)).

17. The same observations are true of *El Chico Corp. v. Poole,* 732 S.W.2d 306 (Tex.1987), in

which a liquor license holder was held liable for injuries to third parties caused when its patron, Saenz, after drinking heavily at its restaurant, sped through a red light and collided with Poole's car. *See id.* at 308, 311.

affirmed on the basis that Van Horn owed no duty to Johnson and Ronald Chambers in connection with the medical care he rendered to Long.

The conflicting summary judgment evidence presented was sufficient to raise an issue of fact concerning whether Van Horn fully adhered to the appropriate standard of care in rendering medical care to Long, or instead deviated from that standard in rendering that treatment. Accordingly, we hold that the summary judgment cannot be affirmed on the basis that Van Horn did not breach the duty he owed to Johnson and Ronald Chambers in connection with the medical care he rendered to Long.

Finally, the same summary judgment evidence was sufficient at least to raise a fact issue concerning whether Van Horn's conduct was, with respect to Johnson's injuries or Ronald Chambers' death, a cause in fact. We have already noted the existence of a fact issue concerning foreseeability of the harm—*i.e.,* the fact issue concerning whether there was a recognizable danger of harm to others visiting, working, or being treated in the hospital such that a reasonably prudent physician would have taken additional precautions, under the same or similar circumstances. Proximate cause consists of cause in fact, plus foreseeability. *Missouri Pac. R.R. Co. v. American Statesman,* 552 S.W.2d 99, 103 (Tex.1977). Accordingly, those two fact issues taken together preclude affirming the summary judgment on the basis that any breach of duty to plaintiffs on Van Horn's part did not proximately cause either Johnson's injuries or Ronald Chambers' death.

Because none of the bases Van Horn proffered in the trial court will support the summary judgment in his favor, we sustain point of error three.

We reverse the summary judgment that was rendered in favor of Van Horn, and remand that part of the case to the trial court. In all other respects, we affirm the judgment.

## OPINION ON MOTION FOR REHEARING & MOTION FOR REHEARING EN BANC

We overrule appellants' motion for rehearing. We further overrule, appellee Gage Van Horn's motion for rehearing and motion for rehearing en banc. We order our original opinion issued on April 25, 1996, published. Tex.R.App.P. 90.

TAFT, J., dissenting from the order overruling Van Horn's motion for rehearing.

WILSON, O'CONNOR, and TAFT, JJ., voted for en banc consideration of Van Horn's motion for rehearing.

SCHNEIDER, C.J., and COHEN, MIRABAL, O'CONNOR, HEDGES and NUCHIA, JJ., voted against en banc consideration of Van Horn's motion for rehearing.

O'CONNOR, J., dissenting.

WILSON, J., dissenting, dissenting opinion to follow.

ANDELL, J., did not participate in the en banc vote.

TAFT, Justice, dissenting.

In our original opinion, we held that Dr. Gage Van Horn owed a common-law duty to Ronald Chambers, a third party injured by a patient who had been under Dr. Van Horn's care. In his motion for rehearing, Dr. Van Horn points out that our opinion (footnote 11, at page 22) sets out the balancing factors used in determining whether to impose a new duty, without conducting an analysis utilizing these factors. I agree that a balancing analysis should be done before imposing a new common-law duty.

### Imposing New Duty

Deciding whether to impose a new common-law duty of care to third parties involves complex considerations of public policy requiring application of contemporary social, economic, and political attitudes to the particular facts at hand. *Graff v. Beard,* 858 S.W.2d 918, 920 (Tex.1993) (citing *H.W. Mitchell v. Missouri–Kansas–Texas R.R.,* 786 S.W.2d 659, 662 (Tex.1990)). Such considerations include the risk, foreseeability, and the likelihood of injury, weighed against the social utility of the actor's conduct, the

magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the actor. *Bird v. W.C.W.*, 868 S.W.2d 767, 769 (Tex.1994). Foreseeability has traditionally been the most significant consideration. *H.W. Mitchell*, 786 S.W.2d at 662. The existence of duty is a question of law for the court to decide from the facts surrounding the event in question. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990) (citing *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 312 (Tex.1983)).

## Facts

When Johnny Long, Jr. was admitted to Hermann Hospital on April 20, 1991, he had been previously treated as an outpatient on several occasions and admitted for three days in 1985 for alcohol withdrawal seizures, all without incident. On the night of April 20th, Long was brought to the emergency room of Hermann Hospital on a backboard with all four extremities in leather restraints. He was diagnosed and treated for both seizure disorder and alcohol withdrawal. In the emergency center, Long was violently combative, kicking, biting, and hitting the medical staff and hospital employees.

After being examined and treated in the emergency room, Long was transferred to the Neurological Critical Care Unit (NCCU) in the early morning hours of April 21st. Later in the day, Long was much more alert, no longer agitated, and had no complaints. He was oriented, pleasant, and cooperative. Dr. Micheline McCarthy saw Long and noted that he did not remember the events of the previous day.

On April 22nd, Dr. Van Horn first saw Long, reviewed his history, and examined him. Long exhibited signs of improvement and his seizure spells had ceased. As a result, Dr. Van Horn transferred Long to a private hospital room on the evening of April 22nd. Dr. Van Horn had no further contact with Long's case.

After being transferred, at about 9:30 p.m., Long was seen by an intern, Dr. Stone, when he became agitated about the prospect of losing his job because of his hospital confinement. Long spoke of marital difficulties, but eventually calmed down and agreed to stay in the hospital room. The next morning, Long became belligerent and assaulted a nurse in an attempt to leave the hospital. Ronald Chambers, a patient-care technician, and others attempted to restrain Long. A struggle ensued and Chambers and three others, including Long, fell through a louvered grill, floor to ceiling in height, which covered an opening to an air shaft. Chambers died instantly. Immediately after the incident, Long was taken to the emergency room and leather restraints were placed on him once again.

## Balancing Analysis

Before deciding to impose a duty of care upon Dr. Van Horn toward third parties injured by a patient who had been under his care, we should analyze Dr. Van Horn's conduct of transferring Long to a less restrictive environment, in terms of: (1) risk; (2) foreseeability; (3) likelihood of injury; (4) social utility of conduct; (5) magnitude of the burden of guarding against the injury; and (6) consequences of placing that burden on Dr. Van Horn.

### A. Risk, Foreseeability, and Likelihood of Injury

Risk, foreseeability, and likelihood of injury are interrelated concepts capable of being considered together. Foreseeability is defined as the general character of injury that a person of ordinary intelligence should have anticipated his negligent act could cause. *See El Chico Corp. v. Poole*, 732 S.W.2d 306, 313 (Tex.1987). Before liability will be imposed, there must be sufficient evidence indicating that the defendant knew or should have known that harm would befall a victim; absent such a showing, a defendant is absolved of liability. *Greater Houston Transp. Co.*, 801 S.W.2d at 526.

Although our original opinion does not specify what evidence we relied upon to create a fact issue regarding foreseeability, much less how the circumstances in general gave rise to foreseeability for purposes of imposing a new common-law duty, Dr. Kramer's affidavit is the only source of such evidence that was set out. Dr. Kramer's affida-

vit emphasizes the fact that, upon admission, Long's secondary diagnosis had been alcohol withdrawal and there was no indication in the records that Dr. Van Horn had considered treating Long for alcohol withdrawal. In Dr. Kramer's expert opinion, Long was displaying symptoms of alcohol withdrawal while in the NCCU which Dr. Van Horn did not take into consideration in his decision to transfer Long from the NCCU to a private room. Dr. Kramer based his opinion on medical records from the NCCU supported by Dr. Stone's notes from the evening of April 22nd that indicated Long was "quite agitated and aggressive on arrival to room as is *apparently a frequent occurrence* for him." To Dr. Kramer, this statement suggested that hospital records available to Dr. Van Horn revealed that Long had a previous medical history of violent and aggressive behavior that should have been addressed.

Dr. Kramer's affidavit did not mention any specific symptom of alcohol withdrawal reflected in the medical records, or even explain what the symptoms of alcohol withdrawal are. I am concerned with the conclusory nature of Dr. Kramer's expert opinion. While the job of understanding medical records is admittedly difficult to the untrained eye, there does not appear to be any indication of a symptom of alcohol withdrawal in the NCCU records attached as summary judgment evidence. Perhaps the absence of any such symptom is the reason for Dr. Kramer's observation that Dr. Van Horn did not consider treating Long for alcohol withdrawal. The only apparent basis for concluding there was a symptom of alcohol withdrawal is that Long was given the prescriptions suggested by the emergency room doctor for alcohol abuse. However, even the medical records giving the emergency room doctor's orders upon transfer to the NCCU indicate a question mark by the secondary diagnosis of alcohol withdrawal. Other than the administration of the two prescriptions for alcohol abuse, which Long's wife denied throughout the medical records, there is no apparent indication of a symptom of alcohol withdrawal. To the contrary, upon receipt at the NCCU Long was drowsy, but oriented. The next day, when seen by Dr. Van Horn, Long was alert, oriented to person, place, and time, AND exhibiting coherent and fluent speech, with no memory of the events of the previous day.

Dr. Kramer's affidavit stated his opinion, that Long exhibited symptoms of alcohol withdrawal in the NCCU, was supported by Long's behavior after being transferred to a private room. Dr. Stone's notes reflected that Long was agitated, Long wanted to go home, and that it was apparently a frequent occurrence for Long to be agitated and aggressive. This indicated to Dr. Kramer that Long had a previous medical history of violent and aggressive behavior that Dr. Van Horn should have taken into consideration.

Long's medical records covering treatment at Hermann Hospital over the past 15 years were included in Dr. Van Horn's summary judgment evidence. There are several instances of out-patient treatment and one admission for a period of three days for alcohol withdrawal seizures. In none of the records is there any indication of violence or misbehavior of any kind. Dr. Kramer's conclusion is based on what he took to be a "suggestion" of the existence of medical records from a statement in Dr. Stone's report that agitation and aggression is apparently a frequent occurrence for Long. While Dr. Kramer's conclusion is so speculative as to arguably be without any foundation at all, it is also based on observations by Dr. Stone that occurred after Dr. Van Horn had made his decision to transfer Long.

An analysis of foreseeability should be confined to the facts known to Dr. Van Horn at the time he ordered Long's transfer from the NCCU. In light of Long's nonthreatening prior medical history at Hermann, his positive reaction to medication, his positive EEG results, his pleasantness and cooperativeness, his having forgotten the events of the day before when he was combative, his lack of seizure spells in two days, and in the absence of any apparent symptom of alcohol withdrawal in the NCCU medical records, I would conclude that the risk, foreseeability, and likelihood of Long injuring others were exceedingly slight, if any, due to his improved medical condition.

## B. Social Utility

Dr. Van Horn's transfer of Long was socially useful because treatment of patients with seizure disorders requires the least restrictive environment possible, according to summary judgment evidence provided by Dr. Wilder's affidavit. It was also undoubtedly less expensive for Long to be in a private room than the NCCU. On the other hand, there is an obvious lack of social utility if mental patients are released from restraint before they can safely interact with others.

## C. Magnitude of Burden

The magnitude of the burden of keeping Long in the NCCU rather than transferring him to a private room is not overly burdensome or expensive by itself. However, it would be an undue burden to require obviously improved patients to remain in NCCU in the absence of indications they would be a danger to themselves or others. This demonstrates the importance of the foreseeability factor throughout the balancing process.

## D. Consequences of Burdening Physicians

Dr. Van Horn claims that the duty placed on him by our original opinion renders him a patient's insurer or jailer. He refers to reported cases in which physicians have been sued for placing patients in restraints—making a "darned if he does, darned if he doesn't" argument. It is common knowledge that medical costs have risen drastically because of the extra care physicians feel constrained to provide to avoid lawsuits. The legislature so found in enacting the Medical Liability and Insurance Improvement Act.[1] I would conclude the consequences of imposing a burden of continuing to restrain a patient who reasonably appears ready for less restriction are too severe.

## Conclusion

Therefore, after applying the balancing considerations to the facts at hand, I would hold that Dr. Gage Van Horn did not owe a duty to Chambers. I would affirm the trial court's summary judgment.

1. TEX.REV.CIV.STAT.ANN. art. 4590i, § 1.02(a) (Ver- non Pamph.1997).

COHEN and MIRABAL JJ., also participating.

WILSON, J., dissenting from the denial of en banc consideration and joining this dissent.

O'CONNOR, Justice, dissenting.

I disagree with the majority's resolution of point of error three.

The panel begins its opinion and its discussion of point three by identifying the issue—did the doctor owe a duty to third parties in his treatment of his patient. *See* 961 S.W.2d at 177, 186. Instead of addressing that issue, the panel opinion goes off on other issues—the duty to control the conduct of another and the duty owed when a person voluntarily assumes a duty to act. Neither is relevant to the resolution of this case.

The dissenting opinion by Justice Taft properly addresses the duty issue. The only reason I do not join the dissent by Justice Taft is that I believe this Court has already resolved the issue in this case in *Flynn v. Houston Emergicare, Inc.*, 869 S.W.2d 403 (Tex.App.—Houston [1st Dist.] 1993, writ denied).

The panel's opinion unsuccessfully attempts to distinguish *Flynn* from the law and the facts in this case. *Flynn*, however, is the only case cited in the panel's opinion that is relevant, based on both the facts and the law. In *Flynn*, the patient was treated for cocaine withdrawal; in this case, the patient was treated for alcohol withdrawal. In *Flynn*, the doctor released the patient without warning him that he might have a delayed reaction to the cocaine; here, the doctor removed the restraints on the patient and had him moved to an unsecured floor. In *Flynn*, the patient injured the plaintiffs on his way home when the delayed reaction to cocaine withdrawal caused a car wreck; here, the patient injured the hospital employees because he was under-medicated. In *Flynn*, the doctor moved for summary judgment

based on no duty because there was no doctor-patient relationship with the injured plaintiffs; here, the doctor moved for summary judgment based on no duty to the injured hospital employees. In *Flynn*, we affirmed the summary judgment; here, we reverse the summary judgment.

I think we should affirm the summary judgment in this case, based on *Flynn*.[1]

WILSON, J., joins in this dissent.

---

1. In *Flynn*, I dissented from the majority opinion. Once *Flynn* established the law on this issue for this Court, we should observe the principles of stare decisis and affirm in this case.