**Pamela WILLIAMS, Appellant,**

v.

**SUN VALLEY HOSPITAL, Appellee.**

No. 08–85–00348–CV.

Court of Appeals of Texas,
El Paso.

Jan. 7, 1987.

Rehearing Denied Jan. 28, 1987.

Cliff Preslar, Demarest & Smith, Dallas, for appellant.

Paul W. Dudley, Dudley, Dudley, Collins & Windle, El Paso, for appellee.

Before OSBORN, C.J., and FULLER and WOODARD, JJ.

## OPINION

OSBORN, Chief Justice.

Our opinion and judgment issued on November 26, 1986, are withdrawn and the following is the opinion of the Court.

Does a hospital treating a voluntarily admitted mental patient have a duty to the general public to keep the patient confined so as to prevent an injury to a member of the general public? We conclude that there was no duty in this case and the judgment of the trial court is affirmed.

## FACTS

The basic facts are not in dispute. On May 13, 1982, a nineteen-year-old male, Alejandro Herrera, voluntarily admitted himself to Sun Valley Hospital. Just prior to the admission, Dr. Boris Kaim, a psychiatrist at the hospital, had been contacted by the patient's family concerning Mr. Herrera's restlessness, depression and crying spells. The doctor was familiar with the fact that Mr. Herrera had been hospitalized on two prior occasions within the past year. Dr. Kaim referred Mr. Herrera to Dr. Jorge Gomez, another psychiatrist, who concluded that the patient was suffering from acute psychosis which manifests itself in slight delusional spells, restlessness and depression. His diagnosis was schizophrenia of the undifferentiated type which is not characterized by aggressive behavior to others.

Mr. Herrera was assigned to Wing II of the hospital and was to be allowed to participate in group activities and allowed access to the hospital grounds with other patients.

On May 15, 1982, while in a patio area, Mr. Herrera left the hospital grounds, apparently by climbing over a brick wall described as being seven to ten feet high. His absence was discovered within ten minutes, but he was not located in a search of the area. Mr. Herrera made his way to a main street in El Paso and apparently jumped in front of a car being driven by the Appellant, Pamela Williams. She sues for injuries she claims from the impact which resulted in Mr. Herrera's death. Her amended petition alleged the hospital was negligent:

1. In failing to maintain or construct a wall high enough to prevent a patient from climbing over it;

2. In placing the patient in the area, when they knew that the wall was not high enough to prevent his escape; and

3. In failing to constantly supervise the patient, in order to immediately determine that he had escaped.

The hospital filed a motion for summary judgment contending it owed no duty to Pamela Williams and that the alleged collision and alleged injuries could not have been reasonably foreseen. The attached affidavits of Drs. Kaim and Gomez state that this patient did not have a history of aggressive behavior, that he had never escaped from a hospital admission and in their opinion posed no danger to the general public or to Pamela Williams in particular. There is deposition testimony from a psychiatric nurse that the patient's hospital chart reflected that he had struck a staff worker on some unidentified occasion. This witness also testified that having signed himself into the hospital as a voluntary patient, Mr. Herrera also had the right to sign himself out. She also testified as follows:

Q. If Mr. Herrera had asked you to leave the hospital, what would have been the procedure for releasing him?

A. If he had asked me that he wanted to leave the hospital? Okay. I would have talked to him first, for his reasons for wanting to leave, and once I found out, and he still wanted to leave, I would call the doctor and let him know that he wanted to leave.

Q. In other words, you would not be able to let him leave without first consulting his doctor?

A. Well, if he absolutely insisted and he is a voluntary patient, I really couldn't keep him.

## DISCUSSION

By two points of error, the Appellant contends that the trial court erred in granting summary judgment because a question of fact existed as to whether the hospital owed a duty to the plaintiff to see that its patients did her no harm and that a fact issue existed as to whether the hospital could reasonably have foreseen that its patient, negligently permitted to escape, might do harm to others.

When considering the duty owed by doctors or a hospital for harm caused by a mental patient, the leading cases are *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976), and *Thompson v. County of Alameda*, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (1980). In the *Tarasoff* case, a voluntary outpatient who was receiving therapy at a hospital at Berkeley advised his therapist that he was going to kill an unnamed but readily identifiable girl. The therapist decided that the patient should be committed for observation in a mental hospital. The patient was taken into custody by the police but released on his promise to stay away from the girl. Sometime thereafter he did, in fact, kill the girl. Her parents filed suit asserting negligence in permitting the patient's release from police custody without notifying the girl's parents that their daughter was in danger. In finding a duty in this case, the court said:

> In our view, however, once a therapist does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, he bears a duty to exercise reasonable care to protect the foreseeable victim of that danger. While the discharge of this duty of due care will necessarily vary with the facts of each case, in each instance the adequacy of the therapist's conduct must be measured against the traditional negligence standard of the rendition of reasonable care under the circumstances.... "In sum, the therapist owes a legal duty not only to his patient, but also to his patient's would-be victim and is subject in both respects to scrutiny by judge and jury."

In *Thompson v. County of Alameda*, supra, the court considered a case where a juvenile, with dangerous and violent propensities regarding young children, killed a young child within twenty-four hours of his release from custody on a temporary leave to the custody of his mother. The court recognized clearly identifiable limitations upon the rule announced in *Tarasoff*. In commenting on that earlier decision, the court said:

> Thus, we made clear that the therapist has no *general* duty to warn of each threat. Only if he "does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, [does he bear] a duty to exercise reasonable care to protect the *foreseeable victim* of that danger." (17 Cal.3d at p. 439, 131 Cal. Rptr. at p. 25, 551 P.2d at p. 345, italics added.) Although the intended victim as a precondition to liability need not be specifically named, he must be "readily identifiable." ...

> Unlike *Johnson* [*v. State*, 69 Cal.2d 782, 795, 73 Cal.Rptr. 240, 447 P.2d 352 (1968)] and *Tarasoff*, plaintiffs here have alleged neither that a direct or continuing relationship between them and County existed through which County placed plaintiffs' decedent in danger, nor that their decedent was a foreseeable or readily identifiable target of the juvenile offender's threats. Under such circumstances, while recognizing the continuing obligation of County, as with all public entities, to exercise reasonable care to protect *all* of its citizens, we decline to impose a blanket liability on County for failing to warn plaintiffs, the parents of other neighborhood children, the police or James' mother of James' threat.

The court in that case rejected any duty to warn the general public and limited the duty to "the potential victims [who] were specifically known and designated individuals."

Those decisions were cornerstones upon which both the trial and appellate courts decided *Brady v. Hopper*, 570 F.Supp. 1333 (U.S.D.C.Colo.1983), aff'd., 751 F.2d 329 (10th Cir.1984). In that case, President Reagan's press secretary, James Brady, and two others injured in an attempted presidential assassination, sued a Denver psychiatrist who had treated John W. Hinckley, Jr. It was asserted that the doctor should have taken steps to have the patient confined and should have warned the parents of their son's extremely dangerous condition. The trial court said the key issue was "to what extent was Dr. Hopper obligated to protect these particular plaintiffs from this particular harm?" In granting a motion to dismiss on the pleadings, the court followed those cases which hold a therapist cannot be held liable for injuries inflicted upon third persons absent specific threats to a readily identifiable victim. With regard to the specific issue of preventing an escape which is raised by the pleadings in our case, Judge Moore in his memorandum opinion said:

> To impose upon those in the counseling professions an ill-defined "duty to control" would require therapists to be ultimately responsible for the actions of their patients. Such a rule would closely approximate a strict liability standard of care, and therapists would be potentially liable for all harm inflicted by persons presently or formerly under psychiatric treatment. Human behavior is simply too unpredictable, and the field of psychotherapy presently too inexact, to so greatly expand the scope of therapists' liability. In my opinion, the "specific threats to specific victims" rule states a workable, reasonable, and fair boundary upon the sphere of a therapist's liability to third persons for the acts of their patients.

On appeal, the trial court's judgment was affirmed. *Brady v. Hopper*, supra. The court relied upon the California cases and noted that in *Thompson*, the court refused to extend the *Tarasoff* obligation where there were no specific threats to specifically identifiable victims.

A case with facts even closer to those in our case is *Anthony v. United States*, 616 F.Supp. 156 (U.S.D.C.Iowa 1985). In that case, John McConnell was admitted as a voluntary patient to a veteran's hospital medical center for treatment of alcoholism. He developed a habit of leaving when he received his pension check and spending his money on an "alcoholic binge." He often drove his car on such occasions. An effort was made to obtain an involuntary commitment, but the proceedings were abandoned. While on leave from the medical center, he was involved in a serious vehicle accident and killed one person. Suit against the government alleged it negligently failed to control the conduct of McConnell so as to prevent the fatal accident.

The court granted summary judgment and followed the California cases. In its opinion, the court said:

> The majority of courts that have addressed the issue at bar have determined that *Tarasoff*-type liability should not extend to create a duty to protect unspecified, unidentified persons. *Brady v. Hopper*, 570 F.Supp. 1333, 1339 (D.Colo. 1983); *Leedy v. Harnett*, 510 F.Supp. 1125, 1130-31 (M.D.Pa.1981); *Thompson*, supra, at 738. The "threats to specific victims" rule is based on a duty to warn and limits what would otherwise be unlimited and strict liability for health care providers who care for and counsel known dangerous persons. *Brady*, supra, at 1139; *Leedy*, supra, at 1130. The Court finds the rationale of those courts persuasive.

> Finally, the Court rejects plaintiff's proposed duty to control. Plaintiff's specification of negligence is bottomed on defendant's failure to confine McConnell. Defendant had no duty or authority to confine McConnell against his will without a valid civil commitment order.

Also see: *Pemberton v. Commonwealth, Department of Mental Health*, 398 S.W.2d 487 (Ky.1966).

Based upon the cited authorities, we conclude that Sun Valley Hospital breached no duty which it owed to Pamela Williams. Where there is no allegation of a threat or danger to a readily identifiable person, we, like those courts whose logic we follow, are unwilling to impose a blanket liability upon all hospitals and therapists for the unpredictable conduct of their patients with a mental disorder. In this case, there was no duty to warn Pamela Williams as she drove on a public street more than a mile from the hospital that a patient had escaped from a mental ward. There is no allegation of a failure to seek a valid involuntary commitment order and there can be no breach of duty to confine a person against his will without a valid civil commitment order.

The Appellant relies upon the decision in *Otis Engineering Corporation v. Clark*, 668 S.W.2d 307 (Tex.1983). We do not believe that case is applicable. The *Otis* decision turned upon the affirmative act of the employer in sending an intoxicated employee home from work and in such a condition that the employer knew he should not have been permitted to drive. In that case, the company contended its conduct amounted to nonfeasance and that there was no affirmative conduct on its part which led to the fatal accident. The court said: "[W]e do not view this as a case of employer nonfeasance." In our case, the hospital did not by its affirmative conduct place Herrera out on the street where the accident occurred. In addition, the evidence reflects that, unlike the Otis employee who had physical manifestations of intoxication when he was required to leave the company plant, Mr. Herrera had never manifest an intention to elope or escape from the hospital prior to his climbing over the wall and leaving of his own accord.

Neither do we find the recent case of *White v. United States*, 780 F.2d 97 (D.C. Cir.1986), applicable. In that case, Dwayne White was confined to a hospital by a court order after his acquittal of murder charges by reason of insanity. He was diagnosed as an "explosive personality" who would become uncontrollably violent if his low tolerance for frustration was exceeded. He had on an occasion related a fantasy about harming his wife to a hospital psychotherapist, but the hospital did not warn her of this threat. Even though he was confined under a court order, hospital officials knew that he was routinely leaving the hospital grounds to visit his wife. In permitting the wife to recover damages for an attack upon her, the court noted that the District of Columbia Code created a presumption of dangerousness which continued for the duration of the patient's mandated confinement. In our case, there is neither a presumption of dangerousness nor an order for confinement of the patient to the hospital.

The Appellant's two points of error are overruled. The judgment of the trial court is affirmed.

FULLER, Justice, dissenting.

I respectfully dissent. Mr. Herrera was designated by the doctors to be placed in Wing II which was for the crisis oriented— acute cases. Evidence in the record from the psychiatric nurse was that anyone in Wing II needed to be watched more closely and Mr. Herrera was in Wing II, a secured area, so he could be watched more closely. While the doctors who gave affidavits for the motion for summary judgment are not parties to this suit, they did state in their affidavits that Mr. Herrera's history was not that of aggressive behavior, but they did admit him to Wing II of the hospital where the typical patients would be those posing a danger to themselves or others. Hospital records indicated that Mr. Herrera had assaulted a staff member. The fact that Mr. Herrera was a voluntary admission to the hospital did not lessen Appellee's duty of care. There is also evidence in the record that there had been discussions at the hospital that the height of the confinement wall was inadequate. Movant had the burden to show no genuine issue of

fact and that it was entitled to judgment as a matter of law, and it must conclusively prove all essential elements of its claim. *City of Houston v. Clear Creek Basin Authority*, 589 S.W.2d 671 (Tex.1979); Rule 166–A, Tex.R.Civ.P. Evidence favorable to the nonmovant will be taken as true and every reasonable inference must be indulged in favor of the nonmovant, and doubts resolved in their favor. *Wilcox v. St. Mary's University of San Antonio*, 531 S.W.2d 589 (Tex.1975).

I would reverse the summary judgment granted by the trial court and remand the case for trial.