**Velia LIMON, Dina L. Casanova, Patricia L. Medina, Rebecca Limon, and Cynthia A. Jaime, Appellants,**

v.

**William GONZABA, M.D., William Gonzaba, M.D., A Professional Association, d/b/a Gonzaba Medical Group, Treatment Associates, Inc., and Will Munoz, M.S., Appellees.**

No. 04–96–00007–CV.

Court of Appeals of Texas, San Antonio.

Jan. 15, 1997.

Rehearing Overruled Feb. 5, 1997.

E.B. Barretto, Law Offices of Sinkin & Barretto, Larry Zinn, San Antonio, for appellants.

William K. Luyties, John A. Culberson, Lorance & Thompson, P.C., Jay D. Hirsch, Tina Snelling, Hirsch, Sheiness & Garcia, L.L.P., J. Preston Wrotenbery, Kevin D. Jewell, Magenheim, Bateman, Robinson, Wrotenbery & Helfand, Houston, Edward C. Mainz, Jr., Thornton, Summers, Biechlin, Dunham & Brown, L.C., San Antonio, for appellees.

Before HARDBERGER, C.J., and LÓPEZ, J., CHAPA, C.J.[2].

HARDBERGER, Chief Justice.

This interesting summary judgment case explores a health care provider's duty to warn a possible victim of a mentally ill patient. These cases, of which there were four in Texas before the present case, all explore the *Tarasoff/Thompson* doctrine, which originated in California. This doctrine stands for the proposition that a health care provider may have a duty not only to his ill patient, but to the patient's intended victim if it is foreseeable that the patient will do injury to an identifiable person. The Texas Supreme Court has not spoken on the *Tarasoff/Thompson* duty, but the four prior appellate opinions all seem to indicate that such a duty exists under the proper fact situation. This court also agrees the duty exists, as did the trial court.

These cases are not medical malpractice actions under article 4590i of the Texas Revised Civil Statutes Annotated. The heritage is much older. Such cases are common-law negligence actions involving duty and foreseeability of injury. Facts can raise such a duty if the facts are sufficient to do so. It was the trial court's job to determine at the summary judgment hearing if there was enough proper summary judgment evidence to raise a fact issue, taking the nonmovant's version of any contested facts as true. This is also the appellate court's job in reviewing the trial court's action. We do so.

**FACTS**

Lorenzo Limon was a man with problems on February 4, 1992. He was a substance abuser, divorced, depressed, and had attempted suicide in the past. His daughter took him to the Gonzaba Clinic. He was seen by Will Munoz, an alcohol and drug abuse counselor, for twenty to twenty-five minutes at the clinic. Limon and Munoz had never met before. Munoz is not a physician. He cannot prescribe medication or admit anyone into the hospital. Limon's daughter described to Munoz her father's depression history and expressed her opinion that her father was "a danger to himself and others, and needed to be in a hospital." When questioned by Munoz, Limon said he had been depressed. He mentioned that he was facing an employer-ordered urinalysis test and that he might have a problem because he had smoked "half a joint" recently. He also indicated that his former wife's calls "bothered him" and he was in the process of changing his phone number. Munoz asked Limon if he felt suicidal or homicidal. He said he did not. He also explained he had not made any threats and, in fact, did not even own a gun. Munoz noted Limon had "mild to moderate depression." He referred Limon to the Alamo Mental Health Group for further testing and evaluation. If Limon's daughter harbored any thoughts that her dad might hurt her mother, she kept them to herself. Two days later, February 6, 1992, Limon went to his former wife's home and shot her. She is now a paraplegic.

There are agency questions in this appeal revolving around the relationships between Munoz and the other defendants. The other

2. Chief Justice Alfonso Chapa (retired), not participating.

defendants are Dr. William Gonzaba, the principal physician at the office where Munoz saw Limon; the Gonzaba Medical Group, a professional association; and Treatment Associates, Inc., a corporate mental health/chemical dependency provider with whom Munoz was affiliated. The liability of these other persons and entities are derivative of the liability of Munoz. We deal with Munoz first.

## STANDARD OF REVIEW

We review orders granting summary judgment under the following standards. To prevail on summary judgment, the movant is required to disprove at least one of the essential elements of each of the plaintiff's causes of action. *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991). The movant must show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). In considering whether a material fact issue exists precluding summary judgment, evidence favoring the non-movant should be taken as true, and all reasonable inferences should be indulged in the nonmovant's favor. *Id.; see also Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995). Any doubts are resolved in favor of the nonmovant. *Nixon,* 690 S.W.2d at 548–49.

## THE CALIFORNIA CASES

The original case, which gave a name to the whole doctrine, is *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). In *Tarasoff,* a patient told his psychotherapist he was going to kill a woman. *Tarasoff,* 131 Cal.Rptr. at 21, 551 P.2d at 341. The patient did not identify the woman by name, but she was readily identifiable. *Id.* The psychotherapist did not warn her, and the patient carried out his threat. *Id.* at 19, 551 P.2d at 339. The woman's parents sued for negligence. *Id.* at 21, 551 P.2d at 341. The unusual thing about the case was that the murdered victim was not a patient of the doctor, and under traditional standards there would have been no duty to this stranger. *Id.* at 22, 551 P.2d at 342. The court held the doctor liable, stating:

> [O]nce a therapist does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, he bears a duty to exercise reasonable care to protect the foreseeable victim of that danger.... In sum, the therapist owes a legal duty not only to his patient, but also to his patient's would-be victim and is subject in both respects to scrutiny by judge and jury.

*Id.* at 25–26, 551 P.2d at 345–46.

Four years later, the California court limited the *Tarasoff* doctrine in the case of *Thompson v. County of Alameda,* 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (1980). In a common sense approach, the court said that a therapist does not have a duty to warn if the therapist cannot reasonably identify the victim. *Thompson,* 167 Cal.Rptr. at 80–81, 614 P.2d at 738. *Thompson* involved a juvenile offender, James, who was known to be dangerous and violent to young children. *Id.* at 72, 614 P.2d at 730. Indeed, James had said he would take the life of a young child in the neighborhood. *Id.* He did not say or give any hints as to who he would target. *Id.* Any child in the neighborhood was at risk, and the definition of neighborhood was that contained in James's sick mind. Not knowing who to warn, the therapist did not warn anyone. *Id.* James carried out the threat and, as it turned out, murdered a child who lived only a few doors away from James's mother's house. *Id.*

The *Thompson* court found that imposing a duty on the therapist to warn all parents of small children in the neighborhood would be unreasonably onerous and of questionable value. *Id.* at 79–80, 614 P.2d at 737. The court emphasized that the exact name of the victim need not be disclosed to the therapist, but the victim still must be readily identifiable. *Id.* at 80, 614 P.2d at 738. The court explained:

> In those instances in which the released offender poses a predictable threat of harm to a named or readily identifiable victim or group of victims who can be effectively warned of the danger, a releas-

ing agent may well be liable for failure to warn such persons. Despite the tragic events underlying the present complaint, plaintiffs' decedent was not a known, identifiable victim, but rather a member of large amorphous public group of potential targets. Under these circumstances we hold that County had no affirmative duty to warn plaintiffs, the police, the mother of the juvenile offender, or other local parents.

*Id.*

## THE TEXAS CASES

Texas entered into the *Tarasoff* arena in 1987 in the case of *Williams v. Sun Valley Hospital,* 723 S.W.2d 783 (Tex.App.—El Paso 1987, writ ref'd n.r.e.). The court accepted the *Tarasoff/Thompson* cases as controlling law in Texas, but found the plaintiff's facts not compelling enough to escape summary judgment. *Williams,* 723 S.W.2d at 787. In *Williams,* a mental patient, Herrera, escaped confinement by climbing a high fence, then made his way to a major highway and jumped in front of a car. *Id.* at 784. Herrera was killed. *Id.* The driver of the car, Pamela Williams, was injured and was the plaintiff in the suit against the confining hospital. *Id.* The court, in affirming the summary judgment in favor of the hospital, stated:

> Where there is no allegation of a threat or danger to a readily identifiable person, we, like those courts whose logic we follow, are unwilling to impose a blanket liability upon all hospitals and therapists for the unpredictable conduct of their patients with a mental disorder. In this case, there was no duty to warn Pamela Williams as she drove on a public street more than a mile from the hospital that a patient had escaped from a mental ward.

*Id.* at 787.

A *Tarasoff*-type case was won by the victim's family, and upheld by the Austin court of appeals in *Kerrville State Hospital v. Clark,* 900 S.W.2d 425 (Tex.App.—Austin 1995), *reversed on other grounds,* 923 S.W.2d 582 (Tex.1996). In *Clark,* an estranged husband murdered his wife while he was on outpatient commitment from the state hospital. *Clark,* 900 S.W.2d at 429. The parents of the deceased brought the lawsuit. *Id.* The court, in affirming the verdict, explained:

> Although we do not decide the issue of duty based on a failure to warn Rebecca of Gary's imminent release and his deteriorating mental condition, we note that a threat need not be made against a *specific victim* in order for the duty to warn to be imposed.

*Id.* at 436 n. 13. The Austin court quoted language from an Arizona case with approval:

> "[W]e agree with those cases interpreting *Tarasoff* which state that a psychiatrist should not be relieved of this duty merely because his patient never verbalized any specific threat.... When a psychiatrist determines, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, the psychiatrist has a duty to exercise reasonable care to protect the *foreseeable victim* of that danger. The foreseeable victim is one who is said to be within the zone of danger, that is, subject to probable risk of the patient's violent conduct."

*Id.* (quoting *Hamman v. County of Maricopa,* 161 Ariz. 58, 775 P.2d 1122, 1127–28 (1989)). Despite the approval of the above language, the Austin court rested its decision in favor of the hospital on grounds other than a duty to warn. *See id.* at 439 (concluding that Kerrville owed duty to control patient through use of drugs after his release and that breach of duty caused death of wife). The Texas Supreme Court reversed the *Clark* decision on sovereign immunity grounds. *Kerrville State Hosp. v. Clark,* 923 S.W.2d 582, 585 (Tex.1996).

Two other Texas courts considered cases with *Tarasoff* facts in 1996 prior to the case that is before this court in this opinion. These cases are *Zezulka v. Thapar,* No. 01–94–01195–CV, —— S.W.2d ——, 1996 WL 37994 (Tex.App.—Houston [1st Dist.] January 29, 1996, n.w.h.), and *Kehler v. Eudaly,* 933 S.W.2d 321 (Tex.App.—Fort Worth 1996, n.w.h.). *Zezulka* involved a seriously mentally ill Vietnam veteran, Lilly, who hated his stepfather, Zezulka. *Zezulka,* —— S.W.2d at

——, at *1. Lilly had earlier slapped his stepfather in public, and he had expressed his desire to kill him to Thapar. *Id.* Thapar was Lilly's psychiatrist. *Id.* On Lilly's last admission to the hospital in August before the murder in September, both the hospital admission notes and Thapar's treatment records reflected that Lilly was homicidal and wanted to kill his stepfather. Shortly after being discharged, he did so. *Id.,* —— S.W.2d at ——, at *2. Thapar had not warned any family member, including the stepfather, of the specific threats Lilly had made during the hospital stay. *Id.,* —— S.W.2d at ——, at *3. In holding that Thapar had a *Tarasoff*-type duty, the court stated:

> We are not asked in this case to hold a doctor responsible to the general public at large. Because Thapar allegedly knew of a specific threat to a specific person, we hold that she had a duty to warn that person.

*Id.,* —— S.W.2d at ——, at *6.

The last of the Texas *Tarasoff*-type cases, *Kehler*, was only decided approximately two months before the present case. This case involved a double murder by a man named Bilby. *Kehler*, 933 S.W.2d at 324. Bilby had earlier been diagnosed with "major depression with melancholia, passive-aggressive personality and prominent anti-social traits." *Id.* at 323. Bilby had just completed a series of electroshock treatments when he called the hospital and told them he was not coming back. *Id.* at 324. Dr. Eudaly, the treating psychiatrist, tried to talk Bilby into returning to his treatment, or at least into continuing his medication. *Id.* Bilby did not return. *Id.* Doctor Eudaly changed Bilby's status to "discharged" on December 12, 1987, with a final psychiatric diagnostic impression of major depressive disorder. *Id.* Eleven days later Bilby killed two people and the next day, two more. *Id.* Some of the survivors sued Dr. Eudaly. *Id.* at 323. There could be little question that Bilby was a sick man, but the issue focused on what duty Dr. Eudaly had to the public at large. Bilby had not expressed any specific intention to kill anyone, or identified anyone that he wanted to harm. *Id.* at 324. Dr. Eudaly brought a motion for summary judgment, which was

granted and affirmed on appeal. *Id.* The case contains a good discussion of *Tarasoff,* and other proximate cause questions, and concludes that "Texas only recognizes duties to third parties if the potential act is foreseeable." *Id.* at 328, 331. The court found that there was no foreseeable duty on the part of Dr. Eudaly:

> While it is likely a foreseeable duty would be recognized in Texas under a *Tarasoff/Thompson* fact situation with an identifiable victim, this case would nevertheless fail to fall within its parameters. Thus, each of the appellees' motion for summary judgment properly responded to the appellants' only viable claim, a claim arising under *Tarasoff/Thompson* that has not yet been affirmatively adopted by our Texas Supreme Court and, in any event, is not applicable here.

*Id.* at 332.

## ANALYSIS AND CONCLUSION

■ The above quote from *Kehler* fits the instant case. This court has no trouble following the philosophical underpinnings of *Tarasoff* and *Thompson*. These cases are based on familiar grounds of common-law duty and its basic building block of foreseeability of harm. A foreseeable duty does not arise until there is an identifiable victim. If the victim is not identifiable, then who is the physician to warn? We agree with appellants that the victim does not have to be named. It is enough if a reasonable health provider could figure it out. This discussion, though, puts the cart before the horse. There are two elements in *Tarasoff* and *Thompson*. Both involve basic foreseeability questions. The first question is whether a reasonable health provider could have foreseen that the patient would injure or kill someone. If a reasonable health care provider could have foreseen that harm would come to someone, then the second question arises—who is the intended victim? If the victim is identifiable, by name or otherwise, the duty to warn the intended victim arises. This may be a factual determination that needs to be decided by a jury. We do not think it is in this case, though, and the trial court was correct in granting the summary judgments based on the evidence before it.

Munoz was interviewing a patient, Limon, that had no history of violence. He was not saying, or even hinting, that he wanted to hurt someone. In fact, he denied it, saying he was neither suicidal nor homicidal. He said his former wife's calls depressed him, along with other things that depressed him. His stated way of dealing with the calls, however, was not confrontational. He simply chose to avoid the problem by changing his telephone number. A husband being upset by his former wife's calls, or vice-versa, is hardly diagnostic of a serious mental illness. It is the usual state of affairs, and probably the reason many of these calls get made. Limon's proposed solution to change his number so his former wife could not reach him was also a well-trod trail, and not a response to alarm anyone. Limon's daughter, Casanova, felt all these conversations were benign. She did not warn her mother, or feel any reason that she should do so. Her father never indicated to her any intentions of harming her mother. She was "totally surprised" when she learned of what had happened. No doubt, so was Munoz.

When all is said and done in life, some things are simply not foreseeable. Foreseeability involves logic, a predictable response to a situation. Mentally ill people, by virtue of their condition, may not be logical, and the actions of a tortured brain may not be foreseeable. On the other hand, they may be. When the patient told the doctor in *Tarasoff* that he was going to kill this readily identifiable girl as soon as she returned home from Brazil, the killing was foreseeable. No doubt there are less foreseeable cases where reasonable minds could differ on foreseeability of the action to come. A specific threat will not always be present, as was recognized in the *Clark* case. *Clark*, 900 S.W.2d at 436 n. 13. And *Tarasoff* said the victim need not be named if they are "readily identifiable." *Tarasoff*, 131 Cal.Rptr. at 21, 551 P.2d at 341. To recognize there may be grey areas in foreseeability, though, is not to say that no evidence is required to raise a foreseeable duty. In our review of the summary judgments in this case, we see nothing in the record that would have raised such a duty on the part of Munoz.

Having found no foreseeability that would raise a duty on the part of Munoz, it is not necessary to address the agency, and other, legal relationships between the other defendants and Munoz. Their liability, if any, would be derivative of that of Munoz, and if Munoz has not breached a duty, then neither have they.

We affirm the summary judgment as to all defendants.