EILEEN F. SHEA, executrix,[1] *vs.* CARITAS CARNEY HOSPITAL, INC., & others.[2]

No. 10-P-900.

Suffolk. March 10, 2011. - May 13, 2011.

Present: BERRY, MEADE, & SIKORA, JJ.

*Negligence,* Wrongful death, Psychiatrist, Licensed independent clinical social worker, Duty to warn. *Practice, Civil,* Wrongful death, Summary judgment.

In a civil action alleging wrongful death caused by the negligence of the defendants (three mental health professionals and the facilities at which they worked) in failing to hospitalize the third party who stabbed to death the plaintiff's decedent, or to warn the plaintiff's decedent of the third party's dangerous propensities, the judge properly granted summary judgment in favor of the defendants, where, under G. L. c. 123, § 36B(1)(*b*) (which limits the circumstances in which a mental health professional has a duty to warn a potential victim), although each individual defendant knew of the third party's history of physical violence (which the language of the statute did not require to be linked to a reasonably identified victim or victims), and even assuming each of the individual defendants was privy to all the evidence contained in the record concerning the third party's mental state leading up to the night of the killing, there did not exist any certain and imminent event or action that would meet the statutory requirement that there exist a clear and present danger that the third party would attempt to kill or inflict serious bodily harm; further, the plaintiff's decedent was not a reasonably identified victim under the statute. [534-540]
There was no merit to the claim in a wrongful death action that three mental health professionals and the facilities at which they worked owed a common-law duty of care to the mother of a patient or to a third party whom the patient later stabbed to death, where G. L. c. 123, § 36B, clearly abrogated any common-law duty owed by a mental health professional to a patient, and it was impossible to glean from the strong language in the statute any intention to permit additional liability based on common law. [540-541]

CIVIL ACTION commenced in the Superior Court Department on September 19, 2005.

---

[1] Of the estate of Richard P. Sheehan.

[2] Dimock Community Health Center, Inc.; Jean Semexant; Richard Spiro; Joseph Sara; and South End Community Health Center, Inc.

The case was heard by *Thomas E. Connolly*, J., on motions for summary judgment, and entry of separate and final judgment was ordered by him.

*Thomas Drechsler* (*Jonathan Tobin* with him) for the plaintiff.

*Steven P. Perlmutter* for Jean Semexant & another.

*Daniel J. Buoniconti* for Joseph Sara & another.

*Jeffrey W. Colman* for Richard Spiro.

MEADE, J. The plaintiff, Eileen F. Shea, as the executrix of the estate of Richard P. Sheehan (Sheehan), appeals from summary judgment entered in favor of the defendants in this wrongful death action. On appeal, Shea claims the judge erred in determining that the statutory requirements of G. L. c. 123, § 36B(1)(*b*), which limit the circumstances in which a mental health professional has a duty to warn a potential victim, could not be met by Shea. Specifically, Shea challenges the judge's determinations that the individual defendants, Jean Semexant, Richard Shapiro, and Joseph Sara, did not have a reasonable basis to believe there was a clear and present danger that Jason Potter would attempt to kill or inflict serious bodily injury, and that Sheehan was not a reasonably identified victim.[3] Shea further contends that G. L. c. 123, § 36B, does not abrogate the defendants' common-law duty to Sheehan to control Potter's conduct. We affirm.

1. *Background.* On the evening of September 25, 2002, Potter stabbed to death his mother, Marie Sheehan, and his stepfather, Sheehan, in their home. During the four days leading up to the killings, Potter had received mental health treatment at Caritas Carney Hospital, Inc. (hospital), from board-certified psychiatrist Richard Spiro; at South End Community Health Center, Inc., from licensed independent clinical social worker Joseph Sara; and at Dimock Community Health Center, Inc., from licensed clinical social worker Jean Semexant. On September 19, 2005, in a complaint filed in Superior Court, Shea alleged wrongful death caused by the negligence of the defendants in failing to hospitalize Potter or to warn Sheehan of Potter's dangerous propensities.[4] In April, 2009, the defendants moved for sum-

---

[3] Any liability of the corporate defendants would be based on the theory of respondeat superior.

[4] Sharon Smith, executrix of the estate of Marie D. Sheehan, was dismissed as a plaintiff by stipulation.

mary judgment, which Shea opposed. On July 31, 2009, the judge granted the defendants' motions, and final judgment entered accordingly.[5]

2. *Facts.* The following facts emerge from the summary judgment record. Potter suffered from a long history of mental health issues and was hospitalized several times during 1997 and 1998. On July 26, 2002, Potter's former girlfriend obtained an abuse prevention order against Potter after he threatened to stab her. The following month, Potter was found guilty of violating the order by coming into close proximity to his former girlfriend. As a result, he was incarcerated until September 18, 2002. During his time in jail, Potter was involved in a fight that left him with a head wound.

Upon his release, Potter stayed with a family friend for several days. She became concerned for Potter's mental health and, on September 22, 2002, took him to the emergency room at the hospital, where they were joined by Potter's mother. During this emergency room visit, hospital security confiscated a knife from Potter. While in the emergency room, Boston emergency services team (BEST) member Ana Maria Valdebenito evaluated Potter and determined that he was disorganized, confused, and depressed. His memory and concentration were poor, and he appeared to be responding to internal stimuli. Valdebenito's report relayed the fact that a knife was recovered from Potter, and she recommended that he be admitted to the hospital as a safety precaution.[6] Potter's mother advised against voluntary admission as she feared Potter would simply check himself out of the hospital, but Potter was nonetheless admitted to the hospital voluntarily.

During his admission, Potter was treated by Dr. Spiro, whose notes indicated that Potter was irritable, disorganized, paranoid, and experiencing racing thoughts, but that he was in good control overall. Potter denied to Dr. Spiro any suicidal or homicidal ideations as well as any hallucinations. Dr. Spiro estimated that

---

[5]Judgment entered against these defendants pursuant to Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974). Potter was named as a defendant in the amended complaint, but it appears that no judgment has entered against him.

[6]Valdebenito's report was reviewed by Dr. Spiro and Semexant as a part of their treatment of Potter.

the length of Potter's hospitalization would be approximately five days. However, on September 23, 2002, Potter requested that he be released. On September 24, 2002, Potter was discharged from the hospital. Dr. Spiro's discharge notes stated that Potter was discharged against medical advice but that his condition had improved, as he appeared less paranoid and depressed, and he was found to be more organized, stable, and near baseline. Potter's risk profile indicated he was impulsive and a noncompliance risk but not a danger to himself or others. Dr. Spiro was aware that Potter was noncompliant with his regular psychiatric medications, had violated the abuse prevention order obtained by his former girlfriend, and had been involved in an altercation while in jail; further, Dr. Spiro was aware that upon Potter's release, he would return to living with his mother and Sheehan.

The next day, Potter and his mother met for approximately eighty minutes with Sara, who had previously treated Potter for mental health issues beginning in September, 1998. During this meeting, Potter spoke to Sara about his violation of the abuse prevention order and the fact that Potter did not feel as though he could trust his family or friends. When asked by Sara if Potter would harm his former girlfriend, Potter stated that he would not hurt her or anyone else. Sara was aware that Potter lived with his mother and Sheehan, that Potter had been noncompliant with his medications since his incarceration, and that Potter had been involved in several verbal arguments with Sheehan in the past. Shea offered evidence of one instance where Potter chased Sheehan with a rake or hockey stick, but it is not clear from the record when this incident took place or what resulted. In any event, Sara was unaware of any physical altercations between Potter and Sheehan. At the conclusion of their meeting, Sara referred Potter to BEST for an evaluation, but Sara himself never communicated with any member of BEST. Later that day, Sara again spoke with Potter's mother, who expressed her concern that Potter was not hospitalized, but she declined Sara's offer to call the police.

Based on Sara's BEST referral, Semexant performed an evaluation of Potter on September 25, 2002. His notes indicated that Potter was cooperative throughout the evaluation, was alert and oriented, and had fair judgment and impulse control, but that he

frequently moved around and displayed poor insight. Potter also denied having any suicidal or homicidal ideations and told Semexant that he "would not hurt a fly" or "hit a woman." Semexant knew Potter resided with his mother and Sheehan, had recently been released from jail for violating an abuse prevention order, and was involved in a fight while incarcerated. Upon learning that Semexant did not intend to hospitalize his son, Potter's father, Barnet Potter, expressed his disagreement with the decision.

Following Semexant's evaluation, Potter returned to his mother and Sheehan's home and stabbed both of them to death. Potter was tried for two counts of murder, and he was found not guilty by reason of insanity.

3. *Discussion.* a. *Standard of review.* Summary judgment is proper only where there is no genuine issue of material fact, and when viewing the evidence in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991); *Godfrey* v. *Globe Newspaper Co.*, 457 Mass. 113, 119 (2010); Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002). "[A] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates, by reference to material described in [rule] 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Kourouvacilis* v. *General Motors Corp.*, *supra.* Our review is de novo, see *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 123 n.1 (1997); we consider the record and the legal principles involved without deference to the judge's reasoning. See *Clean Harbors, Inc.* v. *John Hancock Life Ins. Co.*, 64 Mass. App. Ct. 347, 357 n.9 (2005).

b. *Mental health professional's duty to warn.* To prevail on a claim of negligence, a plaintiff must prove, among other things, that the defendant owed the plaintiff a duty of reasonable care. *Jupin* v. *Kask*, 447 Mass. 141, 146 (2006). "The existence of a duty of care is a question of law and, therefore, is an appropriate subject for summary judgment." *Lev* v. *Beverly Enterprises-Mass., Inc.*, 457 Mass. 234, 240 (2010). "If a defendant does

not owe a legal duty to a plaintiff, then there can be no actionable negligence." *Ibid.* The judge below allowed the defendants' summary judgment motions because he concluded that pursuant to G. L. c. 123, § 36B, Shea failed to establish that the defendants owed any duty to warn or protect Sheehan as a potential victim. We agree.

In 1989, the Legislature enacted G. L. c. 123, § 36B,[7] see St. 1989, c. 117, § 6, which provides, in pertinent part, as follows:

> "(1) There shall be no duty owed by a licensed mental health professional to take reasonable precautions to warn or in any other way protect a potential victim or victims of said professional's patient, and no cause of action imposed against a licensed mental health professional for failure to warn or in any other way protect a potential victim or victims of such professional's patient unless: . . . (b) *the patient has a history of physical violence which is known to the licensed mental health professional and the licensed mental health professional has a reasonable basis to believe that there is a clear and present danger that the patient will attempt to kill or inflict serious bodily injury against a reasonably identified victim or victims and the licensed mental health professional fails to take reasonable precautions as that term is defined by said section one.* Nothing in this paragraph shall be construed to require a mental health professional to take any action which, in the exercise of reasonable professional judgment, would endanger such mental health professional or increase the danger to potential victim or victims." (Emphasis supplied.)[8]

---

[7]The parties stipulated below that G. L. c. 123, § 36B(1)(a), which pertains to circumstances where a patient communicates to a licensed mental health professional an explicit threat to kill or inflict serious bodily injury upon a reasonably identified victim, does not apply to this case.

[8]The Legislature enacted the statute in response to *Tarasoff* v. *Regents of the Univ. of Cal.*, 17 Cal. 3d 425 (1976), the landmark case on the subject of a mental health professional's duty to warn potential victims. See Minehan & Kantrowitz, Mental Health Law § 2.9 (2007). In *Tarasoff, supra* at 432, a student at the University of California at Berkeley told a school psychologist that he was planning to kill an undergraduate student, with whom he was obsessed, upon her return from a summer trip to Brazil. The student did not name his intended victim, but she was easily identifiable as Tatianna Tarasoff. *Ibid.* After the psychologist alerted campus police to the threat and recom-

As the plain language of the statute states, there are limited circumstances in which a licensed mental health professional[9] has a duty to warn a potential victim. For that duty to exist, a plaintiff must establish that (1) the patient has a history of physical violence which is known to the professional; (2) the professional has a reasonable basis to believe there is a clear and present danger the patient will attempt to kill or inflict serious bodily injury; and (3) the potential victim is reasonably identified. If these three elements are met, a duty is created, but a cause of action exists only if the professional fails to take "reasonable precautions," as that term is defined by G. L. c. 123, § 1.[10] G. L. c. 123, § 36B(1)(*b*). If a plaintiff fails to establish any one of the three elements, no duty to warn or protect a potential victim exists as a matter of law.

(i) *History of physical violence.* As the judge properly determined, the evidence, viewed in the light most favorable to Shea, showed that each individual defendant knew of Potter's history of physical violence. All three individual defendants knew that Potter was subject to an abuse prevention order obtained by his former girlfriend and had been incarcerated for violating that order, and that he was involved in a fight during his time in jail. Additionally, Sara knew that Potter had a strained relationship with Sheehan, which included verbal arguments.

mended that his patient be committed, the patient was briefly taken into custody, but he was eventually released. *Ibid.* Neither the psychologist nor the police took any action to warn Tarasoff, who was killed by the patient a few weeks later. Tarasoff's parents brought a negligence complaint against the university and the psychologist. The Supreme Court of California held that "once a therapist does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, he bears a duty to exercise reasonable care to protect the foreseeable victim of that danger." *Id.* at 439.

[9]It is uncontested that each of the individual defendants is considered a "licensed mental health professional" as defined in G. L. c. 123, § 1.

[10]Under G. L. c. 123, § 1, inserted by St. 1989, c. 117, § 4, a licensed mental health professional is deemed to have taken "reasonable precautions" if the professional makes "reasonable efforts" to take one or more of the following actions: "(*a*) communicates a threat of death or serious bodily injury to the reasonably identified victim or victims; (*b*) notifies an appropriate law enforcement agency in the vicinity where the patient or any potential victim resides; (*c*) arranges for the patient to be hospitalized voluntarily; (*d*) takes appropriate steps, within the legal scope of practice of his profession, to initiate proceedings for involuntary hospitalization."

Semexant specifically testified that he was aware of Potter's "history of assaultive behavior" and that Potter was involved in an altercation on the street due to his paranoid delusions.

We disagree with Semexant's position on appeal that in order for Shea to fully satisfy this element of the statute, Potter's history of physical violence must be directly connected to Sheehan. The rules of statutory construction require a phrase to be "given effect consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result." *Welch* v. *Sudbury Youth Soccer Assn.*, 453 Mass. 352, 354-355 (2009), quoting from *Sullivan* v. *Brookline*, 435 Mass. 353, 360 (2001).

The language of the statute does not require that the patient's known history of physical violence be linked to a reasonably identified victim or victims. Had the Legislature intended such a link, it could have included express language to that effect. As previously stated, the statute was created to embrace a mental health professional's carefully limited duty to warn a potential victim when it is plausible that a patient's threat may result in actual harm. To shield a professional from liability when a patient's threat is clear and present but the specific victim has never previously encountered the patient's known physical violence would add an additional limitation not contemplated by the Legislature. Therefore, G. L. c. 123, § 36B(1)(*b*), does not require that a patient's known history of physical violence be directly connected to the reasonably identified victim or victims. Given the evidence presented by Shea, the judge did not err in concluding that each of the defendants knew of Potter's history of physical violence.

(ii) *Clear and present danger.* Shea claims that the defendants had a reasonable basis to believe there was a clear and present danger Potter would attempt to kill or inflict serious bodily injury against another. Shea contends that when analyzing whether a "reasonable basis" existed, the court must consider not only the defendants' actual knowledge at the time of Potter's release but also any information each defendant could have obtained by conducting a reasonable investigation into Potter's mental health history. This claim need not detain us long because, even assuming each of the defendants was privy to all the

evidence contained in the record concerning Potter's mental state leading up to the night of the killings, Shea would still be unable to satisfy this element.

All three individual defendants knew Potter was noncompliant with his regular psychiatric medications. Dr. Spiro knew Potter was found carrying a knife when he arrived at the hospital's emergency room, and he noted Potter was disorganized and paranoid, with racing thoughts. Sara knew Potter had not received regular mental health treatment for several months prior to his release from jail. Potter told Sara that he could not trust his family or friends, and Potter's mother subsequently expressed to Sara her fear concerning Potter's poor decision-making skills when he was not in her care. Finally, Semexant knew a knife had been confiscated from Potter days earlier at the hospital, and he noted Potter was disorganized, confused, depressed, and responding to internal stimuli. Semexant was also aware that Potter's father disapproved of Semexant's decision not to hospitalize Potter.

Despite these indications of Potter's unstable mental state, several unambiguous statements supported the conclusion that Potter posed no clear and present danger to others, or for that matter to himself. When asked directly by all three individual defendants, Potter denied having any suicidal or homicidal ideations. He specifically told Sara that he would not harm his former girlfriend or anyone else, and told Semexant that he "would not hurt a fly" or "hit a woman" when discussing the abuse prevention order against him. Semexant concluded Potter was alert, oriented, and logical, displaying fair judgment and impulse control despite poor insight, while Dr. Spiro eventually noted Potter's good control prior to his discharge from the hospital. Given this evidence, we cannot conclude that there existed any certain and imminent event or action that would meet the requirement that there exist a clear and present danger that Potter would attempt to kill or inflict serious bodily harm.

(iii) *Reasonably identified victim.* Shea also claims that Sheehan was a "reasonably identified" victim for the purposes of G. L. c. 123, § 36B(1)(*b*).[11] She again contends the term

---

[11]In her brief, Shea incorrectly interchanges the terms "identified" and "identifiable." As we explain, the words are not synonymous.

"reasonably identified" not only encompasses the information actually possessed by the defendants at the time of Potter's release but also includes any information the defendants reasonably could have obtained. We decline to adopt such a broad definition of the phrase. We instead conclude that Sheehan was not a reasonably identified victim under the statute.[12]

The word "identified" is the past tense of "identify," which is defined as "to establish the identity of." Webster's Third New Intl. Dictionary 1123 (2002). When we afford the word its plain meaning, see *Welch* v. *Sudbury Youth Soccer Assn.*, 453 Mass. at 354-355, its inclusion in the phrase "reasonably identified victim" means a victim that a mental health professional has all of the information and knowledge necessary to identify without any additional investigation. If the Legislature had intended to require a mental health professional to conduct additional investigation, beyond the scope of his or her work with the patient, it would have chosen a different term, such as "identifiable," which is defined as "subject to identification: *capable* of being identified" (emphasis added). Webster's Third New Intl. Dictionary 1123.[13] The language chosen indicates that

[12]Shea also claims, without citation to authority, that a determination of reasonableness is a question of fact for the jury and not one of law. Even if this rose to the level of an appellate argument, see Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), it would be without merit. Although juries are uniquely qualified to determine the scope of the duty at issue, the existence of a duty, including an ordinary duty of *reasonable* care, "is a question of law appropriate for resolution by summary judgment." *Afarian* v. *Massachusetts Elec. Co.*, 449 Mass. 257, 261 (2007). *Coombes* v. *Florio*, 450 Mass. 182, 187-188 (2007).

[13]Several States that have similar "duty to warn" statutes specifically employ the phrase "identifiable victim" as opposed to "identified victim," further supporting the contention that the Legislature intended a different construction when drafting G. L. c. 123, § 36B. See Ala. Code § 34-8A-24 (LexisNexis 2000); Mich. Comp. Laws Ann. § 330.1946(1) (1999); Neb. Rev. Stat. Ann. § 38-3132 (LexisNexis 2008). Furthermore, some States have adopted the mental health professional's duty to warn through common law using the word "identifiable," but have construed its meaning rather narrowly. For example, in *Limon* v. *Gonzaba*, 940 S.W.2d 236 (Tex. App. 1997), a drug and alcohol counsellor did not have a duty to warn his patient's former wife because she was not considered an "identifiable victim." *Id.* at 241. During the counsellor's twenty-five minute meeting with the patient, whom he had never met or treated, the patient told the counsellor that his former wife's repeated telephone calls to his home "bothered him" but denied threatening her in any way. The patient also denied having suicidal or homicidal thoughts

the Legislature intended a more narrow view of the "reasonably identified victim" element.

Even assuming Shea was correct in her interpretation of the phrase "reasonably identified victim," and each defendant had conducted a thorough investigation to obtain all the information concerning Potter's history with Sheehan, Shea would still be unable to show that Sheehan qualified under the statute as a reasonably identified victim. All three defendants knew Potter had been living in his mother and Sheehan's home and would return to that living situation. Additionally, Sara was aware of verbal arguments that occasionally took place between Potter and Sheehan, and was told by Potter two days prior to the stabbings that he could not trust his family. Finally, Shea presented evidence of a single instance where Potter was rumored to have chased Sheehan with either a rake or a hockey stick, but it is not clear from the record when this took place or how the encounter ended. Without evidence that Potter either stated or even alluded to a threat of physical violence that reasonably could have been understood to have been directed at Sheehan, the evidence presented by Shea is simply not sufficient to show that Sheehan was a reasonably identified victim under the statute.

(iv) *Reasonable precautions.* Because Shea failed to establish the existence of a clear and present danger and a reasonably identified victim as contemplated by the statute, we need not determine whether the defendants failed to take "reasonable precautions." See G. L. c. 123, § 36B(1)(*b*).

c. *Common-law duty.* Shea argues, in the alternative, that the defendants owed a common-law duty of care to Potter's mother and Sheehan based on the defendants' special relationship with Potter. We disagree. Shea's claim is without merit, as G. L. c. 123, § 36B, clearly abrogated any common-law duty owed by a mental health professional to a patient. A statute cannot "be interpreted as effecting a material change in or a repeal of

---

when asked by the counsellor. *Id.* at 237. Although the patient's daughter expressed her concern over the patient's possible dangerous propensities to himself and others, the counsellor released the patient, who then shot his former wife two days later. *Ibid.* The court determined that the patient's comment about his former wife's telephone calls was not enough to categorize her as an "identifiable victim" because it was not foreseeable, and therefore, no duty to warn was imposed on the counsellor. See *id.* at 240-241.

the common law unless the intent to do so is clearly expressed."
*Riley* v. *Davison Constr. Co.*, 381 Mass. 432, 438 (1980), quot-
ing from *Pineo* v. *White*, 320 Mass. 487, 491 (1946). Here, the
statute explicitly states that "[t]here shall be no duty owed by a
licensed mental health professional to take reasonable precau-
tions to warn or in any other way protect a potential victim or
victims of said professional's patient, and no cause of action
imposed against a licensed mental health professional for failure
to warn or in any other way protect a potential victim or victims
of such professional's patient unless" the statutory conditions in
§ 36B(1)(*a*) or § 36B(1)(*b*) are met. G. L. c. 123, § 36B(1).
Given this, it is impossible to glean from such strong language
the intention to permit additional liability based on common
law.[14]

*Judgment affirmed.*

---

[14]Shea's reliance on dicta in *Leavitt* v. *Brockton Hosp., Inc.*, 454 Mass. 37,
42-43 (2009), offers no support for her position, as the Legislature here has
clearly taken action to resolve the issue of a mental health professional's duty
to third parties.